STATE OF NORTH CAROLINA v. CHRISTOPHER DON STYLES

No. 442A07

(Filed 27 August 2008)

**Search and Seizure— traffic stop—failure to signal—reasonable suspicion—motion to suppress evidence of drugs**

The trial court did not err in a possession of Schedule II controlled substances, drug paraphernalia, and marijuana case by denying defendant's motion to suppress all evidence obtained as a result of a traffic stop of defendant's vehicle based on his failure to signal in violation of N.C.G.S. § 20-154(a), because: (1) reasonable suspicion is the necessary standard for traffic stops regardless of whether the traffic violation was readily observed or merely suspected; (2) defendant's vehicle was immediately in front of the officer's patrol vehicle when it changed lanes without a signal, and changing lanes immediately in front of another vehicle may affect the operation of the trailing vehicle; and (3) the officer's observation of defendant's traffic violation gave him the required reasonable suspicion to stop defendant's vehicle.

Justice HUDSON concurrs in the result only.

Justice BRADY dissenting.

Justice TIMMONS-GOODSON joins in the dissenting opinion.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 185 N.C. App. 271, 648 S.E.2d 214 (2007), affirming a judgment entered on 3 November 2005 by Judge C. Preston Cornelius in Superior Court, Swain County. Heard in the Supreme Court 10 December 2007.

*Roy Cooper, Attorney General, by William B. Crumpler, Assistant Attorney General, for the State.*

*Charlotte Gail Blake for defendant-appellant.*

NEWBY, Justice.

In this case we must determine whether defendant's Fourth Amendment rights were violated by the traffic stop that led to his convictions. Because the stop of defendant's vehicle was constitutional, we affirm the decision of the Court of Appeals that affirmed the trial court's denial of defendant's motion to suppress all evidence obtained as a result of the stop.

Around 1:00 a.m. on 28 February 2004, Officer Greg Jones of the Bryson City Police Department was on duty and traveling on Main Street, a three lane road with two lanes in Officer Jones' direction of travel and one lane in the opposite direction. Defendant, who was operating a vehicle moving in the same direction and in front of Officer Jones' patrol vehicle, changed lanes without signaling. Officer Jones stopped defendant's vehicle. Upon approaching the driver's side of the vehicle, Officer Jones immediately detected an odor of marijuana. After defendant declined to consent to a search of his vehicle, Officer Jones deployed a drug-sniffing dog that was in his patrol vehicle. When the dog alerted to the presence of narcotics, Officer Jones initiated a search of the interior of defendant's vehicle, where he discovered marijuana and a pipe. Officer Jones placed defendant under arrest and found methamphetamine on defendant when he conducted a pat-down search.

Defendant was indicted for possession of Schedule II controlled substances, drug paraphernalia, and marijuana. On 25 October 2005, defendant filed a motion to suppress all evidence obtained as a result of Officer Jones' stop of defendant's vehicle. Defendant's motion was denied on 31 October 2005, and defendant pled guilty to all charges, expressly reserving the right to appeal the denial of his motion to suppress under N.C.G.S. § 15A-979(b). The trial court sentenced defendant to six to eight months imprisonment, suspended the sentence, and placed defendant on supervised probation for eighteen months.

On 7 August 2007, the Court of Appeals, in a divided opinion, affirmed the trial court's denial of defendant's motion to suppress. The majority held Officer Jones had probable cause to stop defendant's vehicle because Officer Jones observed a traffic violation by defendant: changing lanes without signaling. *State v. Styles*, 185 N.C. App. 271, 274-75, 648 S.E.2d 214, 217 (2007); *see* N.C.G.S. § 20-154(a) (2007). The dissent argued Officer Jones did not have probable cause to stop defendant's vehicle because there was no competent evidence that defendant's actions constituted a traffic violation. 185 N.C. App.

at ——, 648 S.E.2d at 217 (Stephens, J., dissenting). On 11 September 2007, defendant filed an appeal of right to this Court based on the dissenting opinion. *See* N.C.G.S. § 7A-30(2) (2007).

The Fourth Amendment protects individuals "against unreasonable searches and seizures," U.S. Const. amend. IV, and the North Carolina Constitution provides similar protection, N.C. Const. art. I, § 20. A traffic stop is a seizure "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396, 59 L. Ed. 2d 660, 667 (1979). Traffic stops have "been historically reviewed under the investigatory detention framework first articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)." *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (citation omitted). Under *Terry* and subsequent cases, a traffic stop is permitted if the officer has a "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 675, 145 L. Ed. 2d 570, 576 (2000).

Reasonable suspicion is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Id.* at 123, 120 S. Ct. at 675-76, 145 L. Ed. 2d at 576 (citation omitted). The standard is satisfied by " 'some minimal level of objective justification.' " *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1, 10 (1989) (quoting *INS v. Delgado*, 466 U.S. 210, 217, 104 S. Ct. 1758, 1763, 80 L. Ed. 2d 247, 255 (1984)). This Court requires that "[t]he stop . . . be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training." *State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994) (citing *Terry*, 392 U.S. at 21-22, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906). Moreover, "[a] court must consider 'the totality of the circumstances—the whole picture' in determining whether a reasonable suspicion" exists. *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621, 629 (1981)). *See generally State v. Barnard*, —— N.C. ——, ——, 658 S.E.2d 643, 645 (2008).

"The *Terry* standard was for many years accepted as the standard governing [routine] traffic stops. But, in 1996, dictum of the Supreme Court in *Whren v. United States* raised some doubt." *Delfin-Colina*, 464 F.3d at 396 (internal citations omitted). In *Whren*, the Court stated that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has

occurred." *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 1772, 135 L. Ed. 2d 89, 95 (1996) (citations omitted).

In the years since *Whren*, this Court has occasionally discussed whether a traffic stop was constitutional in terms of probable cause. *See State v. Ivey*, 360 N.C. 562, 633 S.E.2d 459 (2006); *State v. McClendon*, 350 N.C. 630, 517 S.E.2d 128 (1999). At the same time, a distinction has developed in the Court of Appeals by which that court has required probable cause for traffic stops "made on the basis of a readily observed traffic violation," but reasonable suspicion for stops "based on an officer's mere *suspicion* that a traffic violation is being committed." *State v. Young*, 148 N.C. App. 462, 470-71, 559 S.E.2d 814, 820-21 (Greene, J., concurring), *appeal dismissed and disc. rev. denied*, 355 N.C. 500, 564 S.E.2d 233 (2002), *quoted in State v. Wilson*, 155 N.C. App. 89, 94, 574 S.E.2d 93, 97-98 (2002), *appeal dismissed and disc. rev. denied*, 356 N.C. 693, 579 S.E.2d 98, *and cert. denied*, 540 U.S. 843, 124 S. Ct. 113, 157 L. Ed. 2d 78 (2003). The State argues this distinction is incorrect because reasonable suspicion is the standard for both types of traffic stops. We agree.

Subsequent to *Whren*, federal courts have continued to hold that reasonable suspicion remains the necessary standard for stops based on traffic violations. Most recently, in *Delfin-Colina*, the Third Circuit addressed whether, after *Whren*, the required standard for a stop based on a readily observed traffic violation was reasonable suspicion or probable cause: "Was the Court, shifting gears, now requiring 'probable cause' as the predicate for a traffic stop? The consensus is to the contrary. . . . [T]he Second, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits have all 'construed *Whren* to require only that the police have "reasonable suspicion" to believe that a traffic law has been broken.' " 464 F.3d at 396 (quoting *United States v. Willis*, 431 F.3d 709, 723 (9th Cir. 2005) (W. Fletcher, J., dissenting)). In accord with every federal circuit to consider this issue, we hold that reasonable suspicion is the necessary standard for traffic stops, regardless of whether the traffic violation was readily observed or merely suspected.[1] *See id.* at 396-97 (determining that reasonable suspicion is

---

1. Our holding is consistent with *McClendon* and *Ivey*. Neither case concerned a factual situation in which the distinction between probable cause and reasonable suspicion was relevant. As in *Whren*, the issue in *McClendon* was not whether the officer had probable cause to stop the defendant's vehicle, but what weight to give the officer's subjective motivations. 350 N.C. at 635-36, 517 S.E.2d at 131-32. Although we used the term "probable cause" in *Ivey*, the facts of that case make it clear that the officer did not have probable cause or reasonable suspicion to stop the defendant's vehicle. 360 N.C. at 563, 565-66, 633 S.E.2d at 460-62. To the extent language in *Ivey* may be inter-

the appropriate standard for a traffic stop based on a readily observed traffic violation); *Willis*, 431 F.3d at 714-15 (applying reasonable suspicion standard to a traffic stop based on readily observed traffic violations); *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir. 2005) (determining that either reasonable suspicion or probable cause is sufficient to support all types of traffic stops); *United States v. Chanthasouxat*, 342 F.3d 1271, 1275-76 (11th Cir. 2003) (concluding traffic stop based on a readily observed traffic violation would have been reasonable if police officer had either probable cause or reasonable suspicion); *United States v. Ramstad*, 308 F.3d 1139, 1144 (10th Cir. 2002) (requiring probable cause or reasonable suspicion for a traffic stop based on a readily observed traffic violation); *United States v. Callarman*, 273 F.3d 1284, 1286-87 (10th Cir. 2001) (same), *cert. denied*, 535 U.S. 1072, 122 S. Ct. 1950, 152 L. Ed. 2d 853 (2002); *United States v. Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir. 2000) (determining that reasonable suspicion is the appropriate standard for a traffic stop based on a readily observed traffic violation); *United States v. Ozbirn*, 189 F.3d 1194, 1198-99 (10th Cir. 1999) (requiring either probable cause or reasonable suspicion that a traffic violation had occurred).

Having determined that reasonable suspicion is the appropriate standard, we now turn to the facts of this case. Officer Jones stopped defendant's vehicle for failure to signal in violation of N.C.G.S. § 20-154(a), which states in pertinent part:

> (a) The driver of any vehicle upon a highway or public vehicular area before starting, stopping or turning from a direct line shall first see that such movement can be made in safety . . . and whenever the operation of any other vehicle may be affected by such movement, shall give a signal as required in this section, plainly visible to the driver of such other vehicle, of the intention to make such movement.

Defendant argues there is no evidence that the movement of his vehicle could have affected the operation of another vehicle. We disagree.

The trial court found that at the time defendant's vehicle changed lanes without a signal, it was "being operated by the defendant imme-

---

preted as requiring probable cause, we specifically disavow that interpretation. In short, under this Court's post-*Whren* cases, probable cause is sufficient, but not necessary, for a traffic stop.

STATE v. STYLES

[362 N.C. 412 (2008)]

diately in front of" Officer Jones' patrol vehicle. As defendant has not specifically assigned error to this finding of fact, it is not reviewable on appeal. *See State v. Campbell,* 359 N.C. 644, 662, 617 S.E.2d 1, 13 (2005), *cert. denied,* 547 U.S. 1073, 126 S. Ct. 1773, 164 L. Ed. 2d 523 (2006). This finding of fact indicates that defendant's failure to signal violated N.C.G.S. § 20-154(a), because it is clear that changing lanes immediately in front of another vehicle may affect the operation of the trailing vehicle. Officer Jones' observation of defendant's traffic violation gave him the required reasonable suspicion to stop defendant's vehicle. Thus, the trial court's findings of fact support its conclusion of law that defendant's constitutional rights were not violated by the stop.

AFFIRMED.

Justice HUDSON concurs in the result only.

Justice BRADY dissenting.

I cannot concur in the majority's holding that the law enforcement officer who stopped defendant's passenger vehicle had the constitutional authority to do so because the officer had reasonable, articulable suspicion that defendant violated N.C.G.S. § 20-154(a). In doing so, the majority relies upon the trial court's finding of fact that "on February 28th in the early morning hours Officer Jones . . . observed a vehicle being operated by the defendant *immediately* in front of him." (Emphasis added). This finding is based solely upon the following statement made by the officer at the probable cause hearing: "Upon getting behind the vehicle in question, the defendant had changed lanes and failed to signal. That's why I stopped the vehicle." Moreover, the clear, established, and indistinguishable precedent of this Court provides that probable cause is the proper standard in this case. Because there was no competent evidence presented at the suppression hearing or any other proceeding tending to show that the movement of defendant's vehicle affected or might have affected the travel of another vehicle and that, therefore, defendant's failure to use a turn signal violated N.C.G.S. § 20-154(a), I would reverse the decision of the Court of Appeals and the trial court's order and remand the case for further factual findings. Thus, I am compelled to respectfully dissent.

## RELEVANT HISTORICAL BACKGROUND OF SEARCH AND SEIZURE JURISPRUDENCE

The history and development of search and seizure jurisprudence in Great Britain and the United States demonstrate that the issuance of general writs of assistance in the Colonies is widely presumed to be one of the leading causes of the American Revolution. *See* O.M. Dickerson, *Writs of Assistance as a Cause of the Revolution, in The Era of the American Revolution: Studies Inscribed to Evarts Boutell Greene* 40 (Richard B. Morris ed., 1939) ("A[merican] histories without exception list writs of assistance as one of the active causes of the American Revolution."). General warrants—which the Founding Fathers considered evil—were usually "unparticularized warrant[s] (for example, ordering a search of 'suspected places')" or warrants which were issued without "a complaint under oath or an adequate showing of cause." Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 558 (1999) [hereinafter *Original Fourth Amendment*]. In particular, the Founders' primary animadversion was the use of general writs of assistance, which "attested to the authority of the bearer to search places in which the bearer suspected uncustomed goods were hidden," and commanded "that all peace officers and any other persons who were present 'be assisting' in the performance of the search." *Id.* at 561 n.18; *see generally Marcus v. Search Warrant*, 367 U.S. 717 (1961) (brief history of the Fourth Amendment); Letter from Father of Candor to J. Almon, *reprinted in An Enquiry into the Doctrine, Lately Propagated, Concerning Libels, Warrants, and the Seizure of Papers* (Da Capo Press 1970) (1764) (discussing general writs of assistance); Nelson B. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* (Da Capo Press 1970) (1937) (detailed history of early Fourth Amendment development) [hereinafter *History and Development*]; William John Cuddihy, The Fourth Amendment: Origins and Original Meaning, 602-1791 (1990) (unpublished Ph.D. dissertation, Claremont Graduate School) (on file with N.C. Supreme Court Library, Raleigh, N.C.) (lengthy discussion of the origins of the Fourth Amendment). These writs of assistance, at least in England, were issued by the Court of Exchequer, which was authorized by statute to issue the writs to commissioned customs officials and naval officers. *See Original Fourth Amendment* at 561 n.18. General warrants and writs of assistance were controversial not only in the Colonies, but in England as well, where Chief Justice Pratt in *Huckle v. Money* compared the general warrant to the Spanish Inqui-

sition and found the general warrant to be "worse," calling it "a law under which no Englishman would wish to live an hour." 2 Wils. 206, 207, 95 Eng. Rep. 768, 769 (K.B. 1763); *see also Money v. Leach*, 3 Burr. 1742, 97 Eng. Rep. 1075 (K.B. 1765); *Entick v. Carrington*, 2 Wils. 275, 95 Eng. Rep. 807 (K.B. 1765); *Wilkes v. Wood*, Lofft 1, 98 Eng. Rep. 489 (C.P. 1763).

One of the primary reasons for founding-era hatred of general warrants and general writs of assistance was that both writs conferred upon petty officers broad and unfettered discretion to determine when it was legally proper to conduct a search. *See Original Fourth Amendment* at 578, 582. In fact, Sir Matthew Hale described such warrants as allowing the officer executing the general warrant to be the judge in his own case. Matthew Hale, 2 *The History of the Pleas of the Crown* 150 (George Wilson ed., Dublin 1778). In the Colonies, the disdain for general writs of assistance sparked James Otis's speech in the case of *Petition of Lechmere*: "I will to my dying day oppose, with all the powers and faculties God has given me, all such instruments of slavery on the one hand, and villainy on the other, as this writ of assistance is." John Adams, "Abstract of the Argument" *in* 2 *Legal Papers of John Adams* 139-40 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965); *see also* Quincy's Mass. Rep. 1761-1772, App. I 395-540 (1865) (detailing Massachusetts cases on writs of assistance). John Adams described Otis's speech as the thing that "breathed into this nation the breath of life." Letter from John Adams to H. Niles (Jan. 14, 1818), *in* X *The Works of John Adams* 276 (Boston, Little, Brown & Co. 1856).

After the Revolution, many states inserted clauses banning general warrants into the enumeration of rights in their constitutions. *See History and Development* at 79-82 (discussing state provisions). For instance, the North Carolina Constitution has provided a prohibition against general warrants since the first constitution in 1776: "General warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted." N.C. Const. art. I, § 20. During the state legislatures' debates on ratification of the United States Constitution, the lack of a bill of rights, specifically the absence of a provision against general warrants, was discussed in detail. *See History and Development* at 92-97. Eventually, a search and seizure amendment was proposed by James Madison in the United

States Congress during the drafting of the Bill of Rights. *See id.* at 97-100. Finally, what we now know as the Fourth Amendment to the United States Constitution was submitted to the states and thereafter ratified:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

Fourth Amendment jurisprudence initially developed slowly in the new nation. However, as urban crime became a concern of the federal and state governments, prompting the formation of full-time police forces, Fourth Amendment jurisprudence began to take shape with an increasing emphasis on warrantless searches and seizures. *See Original Fourth Amendment* at 724-34 (discussing modern Fourth Amendment doctrine); *see also History and Development* at 106-43 (detailing early Fourth Amendment precedent). Three Supreme Court of the United States opinions on Fourth Amendment doctrine are apposite to the present case: *Whren v. United States,* 517 U.S. 806 (1996); *Delaware v. Prouse,* 440 U.S. 648 (1979); and *Carroll v. United States,* 267 U.S. 132 (1925).

The issue in *Carroll* was the validity of warrantless automobile stops in the enforcement of the National Prohibition Act. 267 U.S. at 143. Mentioning the similarities between searches for contraband on ships and searches for contraband in automobiles,[2] the Court held a warrant was not required to search an automobile under the circumstances of the case. *Id.* at 149-53. In making this determination, the Court relied upon various customs statutes which allowed warrantless searches of ships, such as 1 Stat. 29, which was passed by the

---

2. The Court declined to apply the same analogy in a later Fourth Amendment case when a defendant sought exclusion of contraband found on a ship, claiming the same standard should apply to ships as to automobiles. In *United States v. Villamonte-Marquez,* the Court held it was constitutional for customs officers to board any vessel at any time and any place without any suspicion of wrongdoing in order to examine the vessel's manifest or other documents. 462 U.S. 579, 580-81 (1983). In doing so, the Court noted that "important factual differences between vessels located in waters offering ready access to the open sea and automobiles on principal thoroughfares in the border area" require a different result. *Id.* at 588; *see also* Martin J. Norris, 1 *The Law of Seamen* § 10:43, at 403-09 (4th ed. 1985).

same Congress that proposed the Fourth Amendment for ratification. *Id.* (citing Act of July 31, 1789, Sess. I, ch. 5, Sec. 24, 1 Stat. 29, 43). The Court in *Carroll* nonetheless limited warrantless automobile searches by clarifying: "[T]hose lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise." 267 U.S. at 154.

Over fifty years later, the Court continued to develop the jurisprudence surrounding warrantless automobile seizures and searches in *Delaware v. Prouse,* in which the Court held an officer's stop of an automobile unconstitutional because the stop was performed without an articulable and reasonable suspicion that the driver was unlicensed. 440 U.S. at 663. The Court stated:

> [E]xcept in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

*Id.*

The evolution of this concept was solidified in *Whren v. United States,* when the Supreme Court held that if an officer has probable cause to believe a traffic violation has occurred, the officer's stop of the driver does not run afoul of the Fourth Amendment. 517 U.S. at 811-19. This is true even if the asserted traffic violation was merely a pretext hiding the officer's subjective reason for the stop. *Id.* Certainly applicable to the issue *sub judice* is that the Supreme Court noted that probable cause is the "*traditional justification*" for police intrusion. 517 U.S. at 817.

Another issue that has frequently arisen in Fourth Amendment jurisprudence is equally applicable to traffic stop cases: When is it permissible to seize a person in the absence of probable cause that a crime has occurred? Beginning with *Terry v. Ohio,* 392 U.S. 1 (1968), the Supreme Court of the United States began developing the idea that in certain situations, a suspect may be stopped for further investigation based upon a reasonable, articulable suspicion that criminal activity is afoot. In *Terry,* a Cleveland, Ohio police detective observed two men, Chilton and Terry, standing at a street corner. *Id.* at

**STATE v. STYLES**

[362 N.C. 412 (2008)]

5. As he continued to observe the men, he noted that one would "leave the other one and walk . . . past some stores," turn around, and then walk back toward the street corner, "peering in the store window again" before conferring with his cohort at the street corner. *Id.* at 6. Once he returned, the other would pace down the street in the same manner. *Id.* The detective observed the two men doing this "ritual alternately between five and six times apiece—in all, roughly a dozen trips." *Id.* The two men then conferred with a third man. *Id.* The third man left, and the two men walked together and stopped in front of Zucker's store, where they once again conversed with the third man whom the officer observed conferring with them earlier. *Id.* The detective then approached the three men, "identified himself as a police officer and asked for their names." 392 U.S. at 6-7. The detective then proceeded to pat down the outside of Terry's clothing and felt a pistol "[i]n the left breast pocket of Terry's overcoat." *Id.* at 7. The detective then discovered a firearm "in the outer pocket of Chilton's overcoat." *Id.* The issue in *Terry* was whether the admission of the firearm found on Terry as evidence against him violated his rights under the Fourth Amendment to the United States Constitution. 392 U.S. at 8.

The Court, in determining that the admission of the firearm did not violate Terry's Fourth Amendment rights, first reaffirmed that " '[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' " *Id.* at 9 (quoting *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). The Court noted that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id.* at 16. After determining that the "stop and frisk" did not violate Terry's rights, the Court stated:

Each case of this sort will, of course, have to be decided on its own facts. We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that *criminal activity may be afoot* and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others

in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30 (emphasis added).

The Court continued to expound upon the doctrine articulated in *Terry* in subsequent cases. In *Sibron v. New York*, 392 U.S. 40 (1968), a companion case to *Terry*, the Court found that a police officer lacked reasonable suspicion that a suspect was involved in narcotics sales when the officer's conclusion was based merely on having observed the suspect speak at length with known narcotics addicts. *Id.* at 64. In so deciding, the Court noted: "The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so." *Id.*

In *United States v. Sokolow*, 490 U.S. 1 (1989), the defendant had been seized at an airport on suspicion of criminal activity involving controlled substances. The Court spelled out the facts which amounted to reasonable suspicion to seize the defendant for further investigation:

Paying $2,100 in cash for two airplane tickets is out of the ordinary, and it is even more out of the ordinary to pay that sum from a roll of $20 bills containing nearly twice that amount of cash. Most business travelers, we feel confident, purchase airline tickets by credit card or check so as to have a record for tax or business purposes, and few vacationers carry with them thousands of dollars in $20 bills. We also think the agents had a reasonable ground to believe that respondent was traveling under an alias; the evidence was by no means conclusive, but it was sufficient to warrant consideration. While a trip from Honolulu to Miami, standing alone, is not a cause for any sort of suspicion, here there was more: surely few residents of Honolulu travel from that city for 20 hours to spend 48 hours in Miami during the month of July.

*Id.* at 8-9 (footnote omitted). In *Sokolow*, the Court noted the difference between seizures of persons based upon probable cause and reasonable suspicion:

In *Terry v. Ohio*, we held that the police can stop and briefly detain a person for investigative purposes if the officer has a rea-

sonable suspicion supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause.

The officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.' " The Fourth Amendment requires "some minimal level of objective justification" for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause.

*Id.* at 7 (citations omitted).

It is in light of this rich historical background and well-established judicial authority that I am compelled to dissent.

## THE CONSTITUTIONAL STANDARD IN THE PRESENT CASE

In *State v. Ivey*, this Court clearly, unambiguously, and *unanimously* stated that "the United States and North Carolina Constitutions require an officer who makes a seizure on the basis of a perceived traffic violation to have probable cause to believe the driver's actions violated a motor vehicle law." 360 N.C. 562, 564, 633 S.E.2d 459, 461 (2006) (citing *State v. McClendon*, 350 N.C. 630, 635-36, 517 S.E.2d 128, 132 (1999)). The majority relegates this clear standard in *Ivey* to "misinterpretations" and only discusses it in passing, stating merely that "this Court has occasionally discussed whether a traffic stop was constitutional in terms of probable cause." *Ivey's* discussion of the standard is indistinguishable from the present case, as the statute under which defendant was stopped is the *exact same statute* that was at issue in *Ivey*.

The principle of stare decisis "is a maxim to be held forever sacred." *Commonwealth v. Coxe*, 4 U.S. (4 Dall.) 170, 192 (Pa. 1800); *see also* Allyson K. Duncan & Frances P. Solari, *North Carolina Appellate Advocacy* § 1-9, at 8 (1989) ("[T]he principle of stare decisis proclaims, in effect, that where a principle of law has become settled by a series of decisions, it is binding on courts and should be followed in similar cases."). It has often been stated that "[t]his Court has never overruled its decisions lightly. No court has been more faithful to *stare decisis*." *Rabon v. Rowan Mem'l Hosp., Inc.*, 269 N.C. 1, 20, 152 S.E.2d 485, 498 (1967). Nevertheless, today the major-

ity has failed to adhere to this high principle, thereby casting doubt on the lasting precedential value of this Court's decisions.

Rather than rely upon the controlling authority of this Court's prior decisions, the majority has sought out non-authoritative opinions of federal circuit courts with which to justify its departure from our case law. This Court has stated:

> State courts are no less obligated to protect and no less capable of protecting a defendant's federal constitutional rights than are federal courts. In performing this obligation a state court should exercise and apply its own independent judgment, treating, of course, decisions of the United States Supreme Court as binding and according to decisions of lower federal courts such persuasiveness as these decisions might reasonably command.

*State v. McDowell*, 310 N.C. 61, 74, 310 S.E.2d 301, 310 (1984), *cert. denied*, 476 U.S. 1165 (1986). We have no need to resort to decisions of lower federal courts when this Court's precedent speaks directly and clearly on the issue. When this Court has spoken on an issue, our lower courts should be able to consider the law settled by the opinions of this Court without the need to resort to time-consuming and tedious searches of the decisions of every other court in the nation in anticipation that the law of North Carolina might change on appeal.

Moreover, thorough research of the federal circuit court cases cited by the majority shows that reliance upon them is misplaced. Nearly every federal circuit case cited by the majority either relies directly on *Berkemer v. McCarty*, 468 U.S. 420 (1984), or cites as authority a circuit court decision that relies on *Berkemer* for the proposition that reasonable suspicion is the only requirement, regardless of the aim of the traffic stop.[3] One case cited by the majority, *United States v. Willis*, 431 F.3d 709, 714 (9th Cir. 2005), goes so far as to parenthetically state that *Berkemer* held "that a traffic

---

3. At times the path back to a misapplication of *Berkemer* twists and turns through several intermediary cases, a thorough presentation of which would only serve to obfuscate, rather than clarify. The only federal circuit court case cited by the majority that does not rely on a faulty interpretation of *Berkemer* is *Holeman v. City of New London*, 425 F.3d 184 (2d Cir. 2005). *Holeman* cites both *Whren* and *United States v. Arvizu*, 534 U.S. 266 (2002), for the proposition that "[t]he Fourth Amendment requires that an officer making such a stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *Holeman*, 425 F.3d at 189-90. Neither *Whren* nor *Arvizu* supports the contention that reasonable suspicion of a traffic violation (as opposed to a crime) is a sufficient basis upon which to stop a vehicle.

stop requires reasonable suspicion." Even a cursory reading of *Berkemer* would disclose that *Berkemer* did not address the issue of the required level of suspicion to stop a vehicle. Instead, the relevant issue in *Berkemer* was whether an individual detained in a routine traffic stop was entitled to *Miranda* warnings. *See Berkemer*, 468 U.S. at 422-23. In analyzing this *Fifth* Amendment issue, the Court noted first that traffic stops are usually brief, and second that "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." *Id.* at 437-38. Therefore, the Court wrote, "In both of these respects, the usual traffic stop is more analogous to a so-called '*Terry* stop,' than to a formal arrest." *Id.* at 439 (internal citation omitted). Because the Court did not require *Miranda* warnings during *Terry* stops, the Court likewise held that *Miranda* warnings are not required for persons temporarily detained during routine traffic stops. *Id.* at 440. In making this analogy the Court stated:

> No more is implied by this analogy than that most traffic stops resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*. We of course do not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a *Terry* stop.

*Id.* at 439 n.29. The circuit courts cited by the majority have certainly assumed much more from this analogy, even turning it into a "holding" that reasonable suspicion is the standard for all traffic stops. Thus, the majority's analysis stands upon cases that perpetuate a faulty reading of a Supreme Court of the United States opinion.[4] The better course of action would have been to simply follow this Court's precedent in *Ivey*.

Although the law of this State was, before today's decision, well settled that probable cause was required to stop defendant for a purported violation of N.C.G.S. § 20-154(a), the State made a lengthy and impassioned argument that probable cause was not required. The State argued, and the majority has agreed, that the standard for traffic stops in North Carolina is reasonable suspicion. In fact, the Assistant Attorney General representing the State at oral arguments said: "I am at war with those who say that probable cause is the standard rather than reasonable suspicion!"

---

4. Moreover, the majority simply makes a blanket statement that reasonable suspicion is the proper standard, without conducting the required balancing test. *See United States v. Place*, 462 U.S. 696, 703 (1983).

The State is correct that in many situations all that would be required to seize a vehicle and its occupants would be a reasonable, articulable suspicion that criminal activity is afoot. For instance, law enforcement may observe certain facts that would, in the totality of the circumstances, lead a reasonable officer to believe a driver is impaired, such as weaving within the lane of travel or driving significantly slower than the speed limit. It would be difficult in such a situation, when no other traffic violation occurs, for an officer to formulate probable cause that the driver is impaired. In such circumstances, an officer would have reasonable suspicion to believe that criminal activity (i.e. driving while impaired) was afoot and could stop the vehicle to make reasonable inquiry. The instances in which this Court has applied a reasonable suspicion standard rather than requiring probable cause are those in which further investigation is warranted to confirm or contradict the officer's reasonable suspicion that criminal activity is afoot.

For instance, in *State v. Mitchell*, this Court found an officer had reasonable, articulable suspicion to believe that the defendant was engaged in criminal activity when he accelerated through a driver's license checkpoint even after being instructed to stop by the officer. 358 N.C. 63, 69-70, 592 S.E.2d 543, 546-47 (2004). In *State v. Foreman*, this Court held that an officer had reasonable suspicion to make further inquiries of the occupants of a vehicle that abruptly turned before reaching a roadblock and who were later found parked in a nearby driveway "bent or crouched down inside the car." 351 N.C. 627, 628-29, 527 S.E.2d 921, 922-23 (2000). Frequently, this Court has described those stops that can be made upon the basis of a reasonable, articulable suspicion as *investigatory* stops. *See State v. Campbell*, 359 N.C. 644, 664, 617 S.E.2d 1, 14 (2005), *cert. denied*, 547 U.S. 1073 (2006); *State v. Hughes*, 353 N.C. 200, 206-07, 539 S.E.2d 625, 630 (2000); *State v. Steen*, 352 N.C. 227, 238-39, 536 S.E.2d 1, 8-9 (2000), *cert. denied*, 531 U.S. 1167 (2001); *State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994).

Thus, this Court's precedent makes it clear that in many situations *in which further investigation is warranted by the facts*, an officer may stop a vehicle on the basis of a reasonable, articulable suspicion that criminal activity is afoot. However, in the case *sub judice*, no further investigation would have been necessary. The officer indicated that he stopped defendant on the basis of his failure to use his turn signal. Either defendant's actions ran afoul of N.C.G.S. § 20-154(a) or they did not. There was nothing further for the officer

to investigate. Because the officer made this stop on the basis of a purported, clearly perceivable, readily observable traffic violation in which further investigation would have been of no value in determining whether a violation of N.C.G.S. § 20-154(a) occurred, the officer was required to have probable cause to believe that defendant violated a motor vehicle law before seizing defendant.

## THE ABSENCE OF COMPETENT EVIDENCE TO SUPPORT THE TRIAL COURT'S FINDING OF FACT

This Court will only consider a trial court's findings of fact conclusive on appeal when they are supported by "competent evidence found in the record." *State v. Peterson*, 361 N.C. 587, 600, 652 S.E.2d 216, 226 (2007) (citing *State v. Cummings*, 361 N.C. 438, 471-72, 648 S.E.2d 788, 808 (2007), *cert. denied*, —— U.S. ——, 128 S. Ct. 1682, 170 L. Ed. 2d 377 (2008)), *cert. denied*, —— U.S. ——, 128 S. Ct. 1682, 170 L. Ed. 2d 377 (2008). Here, there is absolutely *no* evidence (much less competent evidence) to support the trial court's finding of fact "[t]hat on February 28th in the early morning hours Officer Jones . . . observed a vehicle being operated by the defendant *immediately* in front of him."[5] (Emphasis added). The only testimony given by Officer Jones with regard to his location in relation to defendant's vehicle is "[u]pon getting behind the vehicle in question, the defendant had changed lanes and failed to signal." The record is devoid of support for the trial court's finding. Yet solely on the basis of a sixteen-word, confusing, and confounding sentence contained in Officer Jones's testimony, the majority has constructed a favorable record for the State out of whole cloth.

The trial court's findings of fact were also insufficient to support its conclusion of law that Officer Jones had probable cause to stop defendant for a violation of N.C.G.S. § 20-154(a), which provides in pertinent part:

> The driver of any vehicle upon a highway or public vehicular area before starting, stopping or turning from a direct line shall first see that such movement can be made in safety, and if any pedestrian may be affected by such movement shall give a

---

5. The majority asserts: "As defendant has not specifically assigned error to this finding of fact, it is not reviewable on appeal." Assuming *arguendo* that defendant's assignments of error are not specific enough as to this finding of fact, this Court should invoke Rule 2 of the North Carolina Rules of Appellate Procedure to "prevent manifest injustice to a party," N.C. R. App. P. 2, as this "[issue raises] important constitutional questions." *State v. Barden*, 356 N.C. 316, 332, 572 S.E.2d 108, 120 (2002), *cert. denied*, 538 U.S. 1040 (2003).

clearly audible signal by sounding the horn, and *whenever the operation of any other vehicle may be affected by such movement*, shall give a signal as required in this section, plainly visible to the driver of such other vehicle, of the intention to make such movement.

N.C.G.S. § 20-154(a) (2007) (emphasis added). The trial court made no finding of fact whether any vehicle, including Officer Jones's patrol vehicle, may have been affected by defendant's changing lanes. The mere finding by the trial court that Officer Jones's vehicle was immediately behind defendant is not identical to the required finding that Officer Jones's patrol vehicle *might have been affected* by the movement of defendant's vehicle.

The trial court concluded as a matter of law that "the stop by the officer was an investigatory stop in regards to a moving violation that he observed committed in his presence." As noted above, the idea that the officer would have needed to stop defendant in order to make reasonable inquiries whether defendant violated N.C.G.S. § 20-154(a) borders upon the farcical. Either defendant violated the statute in the presence of the officer or he did not. No amount of further investigation was necessary to allow the officer to revisit what he had just observed.

In *Ivey*, this Court noted that there was no indication in the record that another vehicle or any pedestrian might have been affected by the defendant's turn at a T-intersection that only permitted a right turn. 360 N.C. at 565, 633 S.E.2d at 461-62. The only distinction between the instant case and *Ivey* is one without a difference. The fact that the defendant in *Ivey* made a right turn without signaling when only a right turn was available was not dispositive of the case. Rather, the total lack of any evidence that the defendant's actions violated N.C.G.S. § 20-154(a) controlled the case's disposition. Similarly, in this case, there is no such competent evidence. *Ivey* controls the instant case, and at the very least this case should be remanded to the trial court with instructions to hold another hearing to make a proper determination whether Officer Jones's vehicle was or might have been affected by defendant's movement. If not, evidence seized by Officer Jones should have been suppressed by the trial court. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("The exclusionary prohibition extends as well to the indirect as the direct products of such invasions."); *Mapp v. Ohio*, 367 U.S. 643, 654-55 (1961) (applying the exclusionary rule to the

states, thereby barring admission of evidence obtained in violation of the Fourth Amendment in state criminal trials).

## CONCLUSION

As eloquently stated by Supreme Court of the United States Associate Justice Robert Jackson, Fourth Amendment rights

> are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.
>
> But the right to be secure against searches and seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court.

*Brinegar v. United States*, 338 U.S. 160, 180-81 (1949) (Jackson, J., dissenting). I cannot agree that a brief, cryptic, and confusing statement by a law enforcement officer, which conveys insufficient information whether a purported traffic violation occurred, is a sufficient factual basis to support a finding of probable cause. The effect of the majority opinion is to retroactively issue a general warrant to Officer Jones, allowing him to be the judge in his own case, thereby "dangerously exposing the citizens of North Carolina to the potential for unreasonable and arbitrary police practices unchecked by our state's trial and appellate courts." *Barnard*, —— N.C. at ——, 658 S.E.2d at 646 (Brady, J., dissenting). Today, the Court has fallen disappointingly short of enforcing the dictates of the Fourth Amendment and of Article I, Section 20 of the North Carolina Constitution and has disregarded our longstanding precedent. I therefore respectfully dissent.

Justice TIMMONS-GOODSON joins in this dissenting opinion.