An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-990

Filed 18 February 2026

Gaston County, Nos. 22CR055457-350, 22CR055458-350

STATE OF NORTH CAROLINA

v.

AUBREY RENEE WILLIAMS, Defendant.

Appeal by Defendant from judgments entered on or about 20 March 2024 by Judge R. Gregory Horne in Superior Court, Gaston County. Heard in the Court of Appeals 20 May 2025.

> *Attorney General Jeff Jackson, by Assistant Attorney General Grace R. Linthicum, for the State.*

> *Lockamy Law Firm, by C. Scott Holmes, for defendant-appellant.*

STROUD, Judge.

Defendant appeals from judgments following a jury trial convicting her of trafficking heroin by manufacturing; trafficking heroin by transport; trafficking heroin by possession; and possession with intent to manufacture, sell, or deliver heroin. Defendant contends the trial court erroneously denied her motion to suppress, and the admission of the drugs was plain error. We conclude the trial court

did not err in denying her motion to suppress, and there was no error, much less plain error, in the admission of the evidence at trial.

## I.    Factual Background

Defendant does not challenge the trial court's findings of fact, and thus they are binding on appeal. *See State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011) ("[W]hen, as here, the trial court's findings of fact are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal.").

Here, the trial court found[1]:

1.    Officer Trey Clinton of the Belmont police department testified in this case. He has been on the police for four years come October 2023.

2.    Office Clinton was working on March 24, 202[2] when he was dispatched to go to the Handy Pantry store in Belmont which is located within Gaston County. The dispatch indicated the attendant at the convenience store was concerned because there was person in a white vehicle that was slumped over. There was concern expressed that this vehicle had been there before. The caller said they had drug issues in past and people would come there and sit for hours at a time.

3.    Prior to arriving at the Handy Pantry store, Officer Clinton knew that location had a history of people selling drugs and in fact had received prior calls about drug sales at that location.

4.    Officer Clinton parked his car beside the white car. He had no lights or siren on. It was between 7-8 pm

---

[1] Unless otherwise indicated, we quote the trial court verbatim.

and was getting dark.

5.  Once Officer Clinton arrived at the store in uniform and in his patrol car, he saw a white vehicle in the parking lot which fit the description given by dispatch. After he exited his car, he stopped momentarily and spoke to the person, identified as the defendant, through a partially rolled down passenger window. He asked the defendant if she was okay or needed any medical assistance. The defendant indicated she okay and needed no assistance. Officer Clinton then asked the defendant if she could "hang here for a minute?" Officer Clinton was polite and his tone of voice when he asked this question was non-threatening. He displayed no act of force when he asked the defendant this question. A reasonable person would believe she was free to leave.

6.  Officer Clinton then went inside the store and talked to Clerk and confirmed the white car was the car that had been reported.

7.  Officer Clinton then approached the driver side door. The defendant was seated in the driver's seat. He asked the defendant if she needed medical assistance, and ask for ID. The defendant was the only one in the car.

8.  The defendant stated said she did not need medical assistance. She was alert and cooperative.

9.  At no time did Officer Clinton order the defendant out of the car nor did he touch her.

10. The defendant stated she did not have a driver's license but did have an ID. She indicated she knew she was not supposed to drive and was waiting on someone to pick her up. When asked how it was she came to get inside the car the defendant indicated she had been dropped off to meet a friend. The defendant stated her name was Aubrey Williams.

She indicated the car did not belong to her.

11. Once Officer Clinton had the ID which had been voluntarily given to him by the defendant, he went back to his vehicle to run ID and check for outstanding warrants.

12. On or about this approximate time officer Buchanan arrived to assist.

13. At some point both officer Clinton and Officer Buchanan went behind the car and had a discussion. Officer Buchanan indicated he knew the name of Aubrey Williams and she had been discussed in the narcotics division as being suspected of selling drugs out of a local hotel. Officer Buchanan also indicated he knew the white car that was occupied by the defendant was owned by Steven Cash that he has dealt with before.

14. Officer Tristan Buchanan testified. He was employed with the Belmont Police Department and has been there little over 2 years. He currently is a detective in the narcotics division.

15. In March of 2022 he also was with the patrol division and had a K-9 drug sniffing dog.

16. On March 24, 2022, he was working. At approximately 7:20pm he received a call regarding the Handy Pantry on Central Avenue in Belmont. The nature of the call concerned a report by an employee of the Handy Pantry stating she had seen a white female in the parking lot slumped over wheel of vehicle. Having experience in the narcotics division, such a report could mean such person are impaired or are having a medical emergency.

17. Officer Buchanan was the second officer on the scene. He arrived in patrol vehicle and had his uniform on. He parked his car on south side of parking lot no lights and siren. His car did not block

the car occupied by the defendant.

18.     Officer Buchanan saw Officer Clinton in the store and then went to the driver side of the vehicle. He then began speaking to driver from passenger window as part of his assessment of the condition of the defendant - he remembers the defendant saying something about not having a license.

19.     Officer Buchanan recognized the white vehicle as he had encountered it in a previous investigation. Narcotics had stopped this vehicle before with a different driver who was a registered owner who had been in possession of methamphetamine[.]

20.     Officer Buchanan saw that Officer Clinton got ID of the driver. Officer Buchanan continued to talk to the defendant. He asked her if she was ok, what was going on, did she need EMS, things like that.

21.     While Officer Buchanan was talking to the defendant, he observed a silicon container that she had in her hand and watched her as she tried to move it into the console. This silicon container was in plain view. Officer Buchanan had seen such containers in the past in his and knew that such containers were used for storing cocaine and other controlled substances.

22.     Officer Buchanan asked the defendant what the container was she said it was not hers. He asked: "What's that thing you just picked up?" Defendant answered: "I don't know I just picked it up[.]" Officer Buchanan then asked: "Can I see it?" She said sure. Once she handed the container to Officer Buchanan, he opened it up. At no time did the defendant tell Officer Buchanan that he should not open it nor did she protest or object while he opened it or afterwards. When Officer Buchanan opened it he smelled vinegar which he knew, given his training and experience, was consistent with smell of some type of heroin. The substance also had a brown

residue and two small pieces of black tar heroin that he had seen.

23.    Officer Buchanan then asked Officer Clinton to have the defendant exit the vehicle and place her in handcuffs and told her she was being detained.

Thereafter, a dog sniff was conducted, and the dog positively alerted to the presence of a controlled substance within the vehicle. Defendant was indicted for trafficking heroin by manufacture; trafficking heroin by transport; trafficking heroin by possession; and possession with intent to manufacture, sell, or deliver heroin.

## II.    Procedural Background

On 30 March 2023, Defendant filed a motion "to suppress all evidence against her obtained from the (1) unlawful seizure of . . . [her] person and (2) the unlawful search of . . . [her] purported property on March 24, 2022." On 12 April 2023, the trial court denied Defendant's motion to suppress. Defendant was tried by a jury and found guilty of trafficking heroin by manufacturing, transport, possession; and possession with intent to manufacture, sell, or deliver heroin. The trial court entered judgments, and Defendant gave oral notice of appeal.

## III.    Admissibility of Evidence

While Defendant frames her argument as two issues—(1) "the trial court erroneously denied the motion to suppress[,]" and (2) "the erroneous admission of the drugs constituted plain error,"—only one question is really presented before this Court: did the trial court err in admitting the evidence challenged in the motion to

suppress?  (Capitalization altered.)

## A.  Standard of Review

Defendant implicitly concedes she did not object to the admission of the drugs

at trial as she has specifically argued plain error on appeal:

> When a defendant fails to preserve an issue relating to a motion to suppress but specifically and distinctly contends plain error, this Court reviews the issue for plain error. For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty.
>
> In reviewing a motion to suppress evidence, this Court examines whether the trial court's findings of fact are supported by competent evidence and whether those findings support the conclusions of law. Conclusions of law are reviewed de novo.

*State v. Johnson*, 297 N.C. App. 160, 164, 910 S.E.2d 293, 297 (2024) (citations and

quotation marks omitted).  "Under a de novo review, the [C]ourt considers the matter

anew and freely substitutes its own judgment for that of the lower tribunal."  *State v.*

*Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (citation and quotation

marks omitted).

## B.  Defendant's Arguments

Defendant's argument begins with her contentions that the only reason the

officers were investigating was to check on the possible medical condition of the

"slumped" driver reported in the car and the absence of her voluntary consent to the

search of the container. She then proceeds to address reasons why the officers did not have probable cause to conduct a search. Defendant contends (1) her seizure violated the Fourth Amendment because once she was asked to "'hang tight[,]'" the officers "block[ed]" both car doors, and her identification was taken without being returned; (2) thus, her consent to search the container was not voluntary due to the "detain[ment]"; and (3) along with her unlawful seizure and a lack of legal consent, officers did not have (3a) "probable cause or a warrant [to] search" the container nor (3b) would "[t]he drugs . . . have inevitably been discovered by" lawful means. We understand Defendant's focus on probable cause, as it is the standard the trial court used. While we eventually discuss probable cause, the fact is a lower standard is all that was required to stop Defendant. *See State v. Styles*, 362 N.C. 412, 414, 665 S.E.2d 438, 440 (2008) ("Reasonable suspicion is a less demanding standard than probable cause[.]" (citation and quotation marks omitted)); *State v. Carrouthers*, 200 N.C. App. 415, 418-19, 683 S.E.2d 781, 784 (2009) (noting reasonable, articulable suspicion is the standard for an investigatory stop). That standard is reasonable suspicion, and we consider it first because Defendant's stop occurred before any search. *See id.*

## C. Reasonable, Articulable Suspicion to Stop Defendant

> The Fourth Amendment to the Constitution of the United States guarantees that the right of the people to be secure in their persons against unreasonable searches and seizures, shall not be violated. The Fourteenth Amendment makes this provision applicable to the States. Generally, a person can be seized in two ways for the purposes of a Fourth Amendment analysis: by arrest or by investigatory

stop. A formal arrest always requires a showing of probable cause.

By contrast, an officer may detain an individual for an investigatory stop upon a showing that the officer has reasonable, articulable suspicion that a crime may be underway.

*Carrouthers*, 200 N.C. App. at 418-19, 683 S.E.2d at 784 (citations, quotation marks, brackets, and ellipses omitted). Indeed,

[a] police officer may effect a brief investigatory seizure of an individual where the officer has reasonable, articulable suspicion that a crime may be underway. . . . All the State is required to show is a minimal level of objective justification, something more than an unparticularized suspicion or hunch.

*State v. Barnard*, 184 N.C. App. 25, 29, 645 S.E.2d 780, 783 (2007) (citation and quotation marks omitted).

Furthermore,

[r]easonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence. The standard is satisfied by some minimal level of objective justification. This Court requires that the stop be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training. Moreover, a court must consider the totality of the circumstances—the whole picture in determining whether a reasonable suspicion exists.

*Styles*, 362 N.C. at 414, 665 S.E.2d at 439-40 (citations, quotation marks, and brackets, and ellipses omitted). And "[i]f reasonable suspicion for the stop exists before the stop is made, there is no violation of the Fourth Amendment." *State v.*

*Hughes*, 353 N.C. 200, 207, 539 S.E.2d 625, 630 (2000).

Thus, turning to the question of reasonable suspicion, even an anonymous tip

> can provide reasonable suspicion as long as it exhibits
> sufficient indicia of reliability. As previously stated, a tip
> that is somewhat lacking in reliability may still provide a
> basis for reasonable suspicion if it is buttressed by
> sufficient police corroboration.
> What is crucial to the determination of whether the
> anonymous tip in the instant case was sufficiently reliable
> to create reasonable suspicion justifying the stop was the
> information known to the officer *before* the stop was made.
> In the context of an anonymous tip, this means that a tip
> must have sufficient indicia of reliability, and if it does not,
> then there must be sufficient police corroboration of the tip
> before the stop may be made[.]

*Id.* (citations omitted) (emphasis in original).

Here, *before* Officer Clinton asked Defendant to "hang here for a minute" he knew an employee of the Handy Pantry had called about a person in a white vehicle that "had been there before[,]" and the store had "drug issues in [the] past and people would come there and sit for hours at a time." Officer Clinton also "knew that location had a history of people selling drugs and in fact had received prior calls about drug sales at that location." *See generally State v. Brown*, 213 N.C. App. 617, 620, 713 S.E.2d 246, 248-49 (2011) (noting one consideration for establishing reasonable suspicion is "the officer's knowledge of an area's propensity toward criminal activity" (citation, quotation marks, and brackets omitted)). And without turning on lights or sirens Officer Clinton parked at the Handy Pantry beside a car matching the employee's description as it "was getting dark." *See generally Hughes*, 353 N.C. at

207, 539 S.E.2d at 630 ("[A] tip that is somewhat lacking in reliability may still provide a basis for reasonable suspicion if it is buttressed by sufficient police corroboration."); *State v. Campbell*, 188 N.C. App. 701, 706, 656 S.E.2d 721, 726 (2008) (noting "time of day" as a factor in establishing reasonable suspicion).

So turning back to Defendant's arguments—(1) her seizure violated the Fourth Amendment because once she was asked to "'hang tight[,]'" the officers "block[ed]" both car doors, and her identification was taken without being returned; (2) her consent to search the container was not voluntary due to the "detain[ment]"; and (3) along with her unlawful seizure and a lack of legal consent officers did not have "probable cause or a warrant [to] search" the container—even if we assume *arguendo*, that Defendant was seized when the officer first stated, "hang here for a minute," the officers already had reasonable suspicion of criminal activity, *see generally Styles*, 362 N.C. at 414, 665 S.E.2d at 439-40, and consequently the seizure was lawful*, see generally Hughes*, 353 N.C. at 207, 539 S.E.2d at 630. Even if we go so far as to also assume *arguendo* that Officer Clinton was only there to see if the person in the car was suffering from a medical issue, the fact remains that reasonable suspicion allowed him to further detain Defendant. *See State v. Falana*, 129 N.C. App. 813, 816, 501 S.E.2d 358, 360 (1998) ("Once the original purpose of the stop has been addressed, there must be grounds which provide a reasonable and articulable suspicion in order to justify further delay.").

Reasonable suspicion, in other words, the officer's ability to speak "on specific

and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training[,]" *id.*, was established here by the time Officer Clinton asked Defendant to wait in the car.

## D. Probable Cause to Search Container

We also note that while Defendant focuses heavily on a claimed illegal detainment, which we have already addressed, the officers had probable cause by the time the search of the silicon container occurred because

> it is a well-established rule that a search warrant is not required before a lawful search based on probable cause of a motor vehicle in a public vehicular area may take place. Thus, an officer may search an automobile without a warrant if he has probable cause to believe the vehicle contains contraband. A court determines whether probable cause exists under the Fourth Amendment of the U.S. Constitution and Article I, Section 20, of the Constitution of North Carolina with a totality-of-the-circumstances test. *If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.* An officer has probable cause to believe that contraband is concealed within a vehicle when given all the circumstances known to him, he believes there is a fair probability that contraband or evidence of a crime will be found therein.

*State v. Springs*, 292 N.C. App. 207, 214, 897 S.E.2d 30, 36-37 (2024) (emphasis added) (citations, quotation marks, brackets, and ellipses omitted).

> Probable cause is generally defined as a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in

believing the accused to be guilty of an unlawful act. Under the motor vehicle exception, probable cause exists when

the existing facts and circumstances are sufficient to support a reasonable belief that the automobile carries contraband materials. If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.

*State v. Little*, 295 N.C. App. 541, 549, 905 S.E.2d 907, 914 (2024) (citations and quotation marks omitted). Factors supporting the officers' belief that "there is a fair probability that contraband or evidence of a crime will be found therein[,]" *Springs*, 292 N.C. App. at 214, 897 S.E.2d at 36-37, include extensive facts comprised of all those noted for reasonable suspicion and are further noted in italics below:

6. Officer Clinton then went inside the store and talked to Clerk and *confirmed the white car was the car that had been reported*.

7. Officer Clinton then approached the driver side door. The *defendant was seated in the driver's seat*. He asked the defendant if she needed medical assistance, and ask for ID. The defendant was the only one in the car.

8. The defendant stated said she did not need medical assistance. She was alert and cooperative.

9. At no time did Officer Clinton order the defendant out of the car nor did he touch her.

10. *The defendant [,though in the driver's seat,] stated she did not have a driver's license* but did have an ID. She indicated she knew she was not supposed to drive and was waiting on someone to pick her up. When asked how it was she came to get inside the car *the defendant indicated she had been dropped off*

*[and left with the car]* to meet a friend. The defendant stated her name was Aubrey Williams. *She indicated the car did not belong to her.*

11. Once Officer Clinton had the ID which had been voluntarily given to him by the defendant, he went back to his vehicle to run ID and check for outstanding warrants.

12. On or about this approximate time officer Buchanan arrived to assist.

13. At some point both officer Clinton and Officer Buchanan went behind the car and had a discussion. *Officer Buchanan indicated he knew the name of Aubrey Williams and she had been discussed in the narcotics division as being suspected of selling drugs out of a local hotel. Officer Buchanan also indicated he knew the white car that was occupied by the defendant was owned by Steven Cash that he has dealt with before.*

14. Officer Tristan Buchanan testified. He was employed with the Belmont Police Department and has been there little over 2 years. He currently is a detective in the narcotics division.

15. In March of 2022 he also was with the patrol division and had a K-9 drug sniffing dog.

16. *On March 24, 2022, he was working. At approximately 7:20pm he received a call regarding the Handy Pantry on Central Avenue in Belmont. The nature of the call concerned a report by an employee of the Handy Pantry stating she had seen a white female in the parking lot slumped over wheel of vehicle. Having experience in the narcotics division, such a report could mean such person are impaired or are having a medical emergency.*

17. Officer Buchanan was the second officer on the scene. He arrived in patrol vehicle and had his

uniform on. He parked his car on south side of parking lot no lights and siren. His car did not block the car occupied by the defendant.

18. Officer Buchanan saw Officer Clinton in the store and then went to the driver side of the vehicle. He then began speaking to driver from passenger window as part of his assessment of the condition of the defendant - *he remembers the defendant saying something about not having a license.*

19. *Officer Buchanan recognized the white vehicle as he had encountered it in a previous investigation. Narcotics had stopped this vehicle before with a different driver who was a registered owner who had been in possession of methamphetamine*[.]

20. Officer Buchanan saw that Officer Clinton got ID of the driver. Officer Buchanan continued to talk to the defendant. He asked her if she was ok, what was going on, did she need EMS, things like that.

21. *While Officer Buchanan was talking to the defendant, he observed a silicon container that she had in her hand and watched her as she tried to move it into the console. This silicon container was in plain view. Officer Buchanan had seen such containers in the past in his and knew that such containers were used for storing cocaine and other controlled substances.*

22. *Officer Buchanan asked the defendant what the container was she said it was not hers. He asked: "What's that thing you just picked up?" Defendant answered: "I don't know I just picked it up[.]"* Officer Buchanan then asked: "Can I see it?" She said sure. Once she handed the container to Officer Buchanan, he opened it up. At no time did the defendant tell Officer Buchanan that he should not open it nor did she protest or object while he opened it or afterwards. *When Officer Buchanan opened it he smelled vinegar which he knew, given his training*

*and experience, was consistent with smell of some type of heroin. The substance also had a brown residue and two small pieces of black tar heroin that he had seen.*

**E. Summary**

In summary, Officer Clinton had reasonable suspicion of criminal activity by the time he spoke to Defendant, asking her to "hang here for a minute[,]" *see generally Styles*, 362 N.C. at 414, 665 S.E.2d at 439-40, and Officer Buchanan had probable cause when he asked to search the container, and thus was legally able to search the container without consent*, see generally Springs*, 292 N.C. App. 207, 214, 897 S.E.2d 30, 36-37. Furthermore, our conclusion as to probable cause means we need not address Defendant's argument regarding inevitable discovery. Thus, the trial court correctly denied Defendant's motion to suppress; there was no error, much less plain error, in admitting the evidence in trial.

## IV. Conclusion

We conclude the trial court did not err in denying Defendant's motion to suppress or admitting the evidence at trial.

NO ERROR.

Judges CARPENTER and WOOD concur.

Report per Rule 30(e).