IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-85

No. 3A20

Filed 13 August 2021

STATE OF NORTH CAROLINA

v.

BRYAN XAVIER JOHNSON

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 269 N.C. App. 76 (2019), finding no error after appeal from an order denying defendant's Motion to Suppress entered on 29 June 2018 by Judge Forrest D. Bridges in Superior Court, Mecklenburg County. Heard in the Supreme Court on 22 March 2021.

> *Joshua H. Stein, Attorney General, by Kristin J. Uicker, Assistant Attorney General, for the State-appellee.*
>
> *Kimberly P. Hoppin for defendant-appellant.*

MORGAN, Justice.

¶ 1    Defendant's appeal requires this Court to review the trial court's order denying defendant's motion to suppress evidence of a bag of narcotics seized from his vehicle during a traffic stop on 14 January 2017. The dispositive question on appeal is whether the law enforcement officers conducting a search for weapons on defendant's person and in the areas of defendant's vehicle under his immediate control possessed the requisite reasonable suspicion to initiate such a warrantless search pursuant to

*Terry v. Ohio*, 392 U.S. 1 (1968). Because we hold that the law enforcement officer who conducted the traffic stop presented articulable facts at the suppression hearing which gave rise to a reasonable suspicion that defendant was armed and dangerous, the trial court did not commit error in denying defendant's request to suppress the controlled substances which were discovered as a result of the search of the areas of defendant's vehicle which were under defendant's immediate control.

## I.   Factual and Procedural Background

As a seven-year veteran of the Charlotte-Mecklenburg Police Department (CMPD) and a member of the law enforcement agency's Crime Reduction Unit, Officer Whitley was conducting patrol operations in the early morning hours of 14 January 2017 in a location of the city that he described at the suppression hearing as a "very high crime area." Officer Whitley and his partner, Sergeant Visiano, were traveling along Central Avenue in the Hickory Grove section of Charlotte when they observed a black Dodge Charger. While Officer Whitley continued to operate their patrol vehicle, Sergeant Visiano ran the license plate displayed on the Dodge Charger through the agency's computer system and discovered that the license plate was actually registered to an Acura MDX. Having determined that the tag displayed on the Dodge Charger was "fictitious," Officer Whitley initiated a traffic stop, and the two vehicles pulled into a Burger King parking lot.

While approaching the driver's side of the Dodge Charger, Officer Whitley

noticed that the car's occupant had raised his hands in the air. It was determined that the individual in the Dodge Charger was defendant. Officer Whitley subsequently testified at the suppression hearing that he had observed persons raising their hands in such a manner ten to twenty times previously and that, based upon his experience which included specialized training in recognizing armed individuals, this behavior can "sometimes . . . mean that they have a gun." Officer Whitley conversed with defendant at the driver's window as defendant remained seated in the Dodge Charger, while Sergeant Visiano positioned himself at the passenger side window in order to see defendant's right side. Officer Whitley asked for defendant's driver's license and registration and inquired about the possible presence of any weapons in the vehicle; defendant denied the presence of such items. Officer Whitley explained that the mismatched license plate served as the reason for the traffic stop, prompting defendant to volunteer that defendant had just purchased the Dodge Charger in a private sale that day and that defendant knew that the displayed tag did not belong to the vehicle that he was driving. Defendant readily produced his driver's license but had to search for the car's registration and bill of sale in the center console of the vehicle. Officer Whitley testified at the suppression hearing that during this interaction, defendant "seemed very nervous . . . like his heart is beating out of his chest a little bit. He was very nervous." Further, as defendant reached into the center console to find the requested documentation,

Officer Whitley recalled during his testimony that defendant was "blading [his body] . . . as if he is trying to conceal something that is to his right, as if he's using his body to distance what I can see from what he's doing." This appeared odd to Officer Whitley, who testified at the suppression hearing that while "typically people obviously reach and turn" to retrieve items from the center consoles of their vehicles, defendant did so "to the extent where his shoulders were completely off the seat."

¶ 4     "[A]t this point," Officer Whitley testified, defendant's positioning of his hands above his head as the officers approached his vehicle, his nervousness, and the "blading" of his body as he reached into the center console were "adding up as . . . characteristics of an armed subject." After defendant produced a bill of sale for the Dodge Charger from the center console, Officer Whitley left defendant in the driver's seat of the vehicle while defendant spoke with Sergeant Visiano. Meanwhile, Officer Whitley returned to his patrol car in order to process the information and paperwork provided by defendant through multiple law enforcement intelligence databases, which is "a standard practice for every traffic stop that" the officer conducts. Information gathered from Officer Whitley's search of North Carolina's CJLEADS system—a database which details a person's history of contacts with law enforcement in the form of a list of criminal charges filed against the individual—indicated that defendant had been charged with multiple violent crimes and offenses related to weapons from the years 2003 through 2009. While he could not offer testimony as to

which charges against defendant had resulted in convictions, Officer Whitley testified that the "trend in violent crime" revealed by the CJLEADS search, combined with the "holding up of the hands, as well as the blading of the body," and the fact that defendant appeared very nervous, "led [the officer] to believe that he was armed and dangerous at that point."

¶ 5      Officer Whitley exited his patrol car, returned to defendant's vehicle, and asked defendant to step out of the Dodge Charger, with the intent of conducting a frisk of defendant's person and a search of the vehicle. Defendant got out of his car and went to the rear door on the driver's side of the vehicle at Officer Whitley's request before defendant consented to be frisked by the law enforcement officer for weapons. A pat down of defendant's clothing revealed no weapons or other indicia of contraband. At this point, Officer Whitley walked to the rear of defendant's Dodge Charger and asked for defendant's consent to search the vehicle. Defendant refused to grant such consent. Officer Whitley then explained that the officers were going to conduct a limited search of defendant's vehicle nonetheless based on defendant's "criminal history . . . and some other things." While defendant continued to protest the search of the Dodge Charger, Officer Whitley left him with Sergeant Visiano and began a search of the front driver's side of defendant's vehicle. Immediately upon opening the unlocked center console, Officer Whitley discovered a baggie of "[w]hat appeared to be powder cocaine" and removed the suspected contraband from the vehicle. After

completing his search of the area of the vehicle immediately behind the driver's seat, Officer Whitley placed defendant under arrest.

¶ 6 On 14 January 2017, defendant was charged with the felonious offense of possession with intent to sell or deliver cocaine and the misdemeanor offense of possession of drug paraphernalia, and was formally indicted by a Mecklenburg County grand jury for possession of cocaine on 25 September 2017.

¶ 7 Defendant filed a motion to suppress on 16 May 2018, which came on for hearing before the Honorable Forrest D. Bridges in Superior Court, Mecklenburg County, on 26 June 2018. Officer Whitley testified about the course of events which resulted in defendant's arrest. Additionally, the trial court viewed Officer Whitley's body camera recording of the incident after defendant's counsel stipulated to the video's admissibility. After hearing arguments from counsel for the State and defendant, the trial court denied defendant's motion to suppress. While defendant initially indicated a desire to proceed to trial, he agreed to plead guilty to felony possession of cocaine and misdemeanor possession of drug paraphernalia after a short recess before the jury was selected. The trial court accepted defendant's guilty plea and noted for the record that defendant had preserved his right to appeal the trial court's earlier ruling on defendant's motion to suppress.

¶ 8 The trial court then asked the State's attorney to prepare an order reflecting the details of the hearing on defendant's motion to suppress. In providing direction

regarding the desired contents of the order, the trial court recounted the factual basis upon which it had concluded that Officer Whitley had established the reasonable suspicion necessary to conduct a *Terry* search[1] of defendant's vehicle. In open court, the trial court recalled the manner in which Officer Whitley had conducted the traffic stop in the location which the officer had described as a high-crime area and the officer's discovery of defendant's prior charges, upon researching the state's criminal record databases, for robbery with a dangerous weapon, assault with a deadly weapon with the intent to kill, and discharging a weapon into occupied property. The trial court noted that defendant raised his hands out of the window of the Dodge Charger as Officer Whitley approached, which had put the officer "on alert for the possible presence of a gun within the vehicle." In addition, the trial court explained that, while Officer Whitley reasonably believed that defendant's maneuver to raise his hands out of the car's window could indicate the presence of a gun, defendant had acted appropriately in holding his hands up and out of the window "in this day and time," and such conduct was not to be considered independently incriminating. The trial court entered a written order dated 29 July 2018 which included the above findings and concluded:

> 2. That based on the totality of [the] circumstances, *including but not limited to*: the [d]efendant's hands in the air upon the Officer's approach, and the [d]efendant's prior

---

[1] A shorthand reference commonly used to describe a warrantless search which is performed pursuant to the principles stated in *Terry v. Ohio*, 392 U.S. 1 (1968).

criminal history, that the limited frisk of the lungeable
areas of the vehicle was justified.

3. That the Officer's scope of the frisk was properly limited
only to areas where the [d]efendant would have had access
to retrieve a weapon if he chose to do so.

Defendant was sentenced to a term of 8 to 19 months in prison, which was suspended for 24 months of supervised probation. Defendant appealed to the North Carolina Court of Appeals, where a divided panel issued its decision on 17 December 2019 affirming the trial court's denial of defendant's motion to suppress. Defendant appeals to this Court as a matter of right pursuant to N.C.G.S. § 7A-30(2) based upon the dissenting opinion filed in the lower appellate court's consideration of this matter.

## II. Analysis

Defendant argues before this Court that several of the trial court's findings and conclusions announced in open court and reproduced in the subsequent written order in which the trial court denied defendant's motion to suppress were not supported by the evidence. In removing these disputed findings and conclusions from the trial court's contemplation, defendant contends that Officer Whitley did not have a reasonable suspicion that defendant was armed, that the *Terry* search of defendant's vehicle represented an unconstitutional extension of the traffic stop, and that this Court's correction of the trial court's supposed error should result in an outcome which vacates the trial court's order and overturns defendant's conviction. We disagree with defendant's assertions and address them in turn.

## A. Standard of Review

We review a party's challenges to a trial court's findings of fact to ascertain whether those findings are supported by any competent evidence, the presence of which will render such findings binding on appeal. *State v. Reed*, 373 N.C. 498, 507 (2020). The trial court's conclusions of law, including the ultimate conclusion as to whether a law enforcement officer had the constitutional authority to conduct a *Terry* frisk of a defendant's vehicle, are reviewed on a de novo basis. *Id.*

## B. Trial Court's Findings and Conclusions

As an initial matter, defendant complains of the consideration by the Court of Appeals of Officer Whitley's uncontroverted testimony concerning defendant's nervousness and the "blading" of defendant's body as defendant accessed the center console of his vehicle, as well as the lower appellate court's recognition that the traffic stop took place late at night. To bolster his position, defendant observes that the trial court did not make express findings concerning these factors. Although North Carolina statutory law establishes that, "in making a determination whether or not evidence shall be suppressed," the trial court is required to "make findings of fact and conclusions of law which shall be included in the record, pursuant to [N.C.]G.S. [§] 15A-977(f)[,]" N.C.G.S. § 15A-974(b) (2019), nonetheless the reduction of the trial court's considerations to a written order is not required. *State v. Oates*, 366 N.C. 264, 268 (2012) ("While a written determination is the best practice, nevertheless

[N.C.G.S. § 15A-977(f)] does not require that these findings and conclusions be in writing."). In the present case, the trial court, in its discretion, included a recitation of some of the evidence before the tribunal in its written order and specifically noted the sufficiency of the evidence to establish reasonable suspicion in the mind of the officer to support a *Terry* search, which involved the trial court's evaluation of factors which "includ[ed] but [was] not limited to" the factors listed in the written order. "Although [N.C.G.S. § 15A-974(b)'s] directive is in the imperative form, only a material conflict in the evidence" requires a trial court to make "explicit factual findings that show the basis for the trial court's ruling." *State v. Bartlett*, 368 N.C. 309, 312 (2015) (citing *State v. Salinas*, 366 N.C. 119, 123–24 (2012)). Thus, "[w]hen there is no conflict in the evidence," an appellate court may infer a trial court's findings in support of its decision on a motion to suppress so long as that unconflicted evidence was within the trial court's contemplation. *Bartlett*, 368 N.C. at 312 (citing *State v. Munsey*, 342 N.C. 882, 885 (1996)). In applying these enunciated principles to the instant case, the Court of Appeals did not wrongly infer from the uncontroverted evidence before the trial court adduced at the suppression hearing and the subsequent findings and conclusions which the trial court entered in its order, that the factors—among other factors—of Officer Whitley's testimony about defendant's nervousness, defendant's "blading" of his body, and the late hour of the traffic stop constituted circumstances which provided reasonable suspicion for the

*Terry* search to be conducted. The lack of controverted evidence at the suppression hearing strengthened the trial court's ability to choose the evidentiary facts and the resulting persuasive factors which the trial court elected to expressly include in its order.

¶ 13          Furthermore, defendant does not contest the evidence, in the form of Officer Whitley's testimony and the body camera footage viewed by the trial court, regarding defendant's nervousness and defendant's maneuver of "blading" his body; rather, defendant opts to attempt to contextualize these behavioral displays by characterizing defendant's emotional and physical issues during his interaction with Officer Whitley. In this regard, defendant merely attempts to relitigate the veracity of Officer Whitley's interpretation of defendant's conduct. "The weight, credibility, and convincing force of such evidence is for the trial court, who is in the best position to observe the witnesses and make such determinations." *Macher v. Macher*, 188 N.C. App. 537, 540, *aff'd per curiam*, 362 N.C. 505 (2008). The trial court in this matter was "the sole judge of the credibility and weight of the evidence," and it was free to "accept or reject the testimony of a witness, either in whole or in part, depending solely upon whether it believes or disbelieves the same." *Moses v. Bartholomew*, 238 N.C. 714, 718 (1953). For this Court to accept defendant's invitation to reinterpret Officer Whitley's suppression hearing testimony, when the original interpretation of defendant's conduct made by the officer on scene has already been evaluated by the

trial court in a manner contemplated by, and consistent with, the operational structure of our legal system, would be to ignore the trial court's status as "the sole judge of the credibility of the witnesses and of the weight of their testimony." *State v. Johnson*, 230 N.C. 743, 745 (1949).

¶ 14 Likewise, defendant does not challenge the evidentiary basis for the trial court's consideration of Officer Whitley's discovery of defendant's criminal history as a contributing factor to the officer's development of reasonable suspicion to justify the officer's execution of a *Terry* search; instead, defendant submits that the evidence "did not support a finding that Officer Whitley had reasonable concerns for his safety based on [defendant's] prior criminal history." Additionally, defendant endeavors to fortify his impression that the officer's concerns for the officer's safety were not supported by the evidence of the officer's awareness of defendant's criminal history at the time of the traffic stop by emphasizing that the officer did not fully recall at the suppression hearing all of the details and the outcomes of defendant's criminal history, which therefore negated the manifestation of reasonable suspicion in the mind of the officer during Officer Whitley's interaction with defendant. Again, like defendant's concerns about Officer Whitley's observance of defendant's nervousness and "blading" of his body, this amounts to defendant's renewed invitation for our Court to substitute our judgment regarding the veracity and accuracy of a witness's testimony for the determination of a trial court which occupied "the best position to

observe the witnesses and make such determinations." *Macher*, 188 N.C. App. at 540 (quoting *Freeman v. Freeman*, 155 N.C. App. 603, 608 (2002)). Here, Officer Whitley testified without contravention that he "discovered that the defendant did have a history, violent history, related to firearms" in the form of various charges extending from 2003 to 2009, which the officer described as a "trend in violent crime" that, in conjunction with the other evidentiary facts already discussed, "led [him] to believe that [defendant] was armed and dangerous at that point." Defendant's position from this cosmetically different, yet fundamentally identical, premise is also without merit.

¶ 15        By way of review, the unconflicted evidence introduced by the State at the hearing conducted by the trial court on defendant's motion to suppress—that (1) the traffic stop occurred late at night (2) in a high-crime area, with (3) defendant appearing "very nervous" to the detaining officer to the point that it "seem[ed] like his heart [was] beating out of his chest a little bit[,]" with (4) defendant "blading his body" as he accessed the Dodge Charger's center console, and (5) defendant's criminal record indicating a "trend in violent crime" and weapons-related charges—was sufficient for the trial court to make findings of fact and conclusions of law that the investigating law enforcement officer had reasonable suspicion to conduct a *Terry* search of defendant's person and in areas of defendant's vehicle under defendant's immediate control for the officer's safety.

## C. Reasonable Suspicion for the *Terry* Search

Both the Fourth Amendment to the Constitution of the United States and article I, section 20 of the North Carolina Constitution protect private citizens against unreasonable searches and seizures. *State v. Otto*, 366 N.C. 134, 136 (2012). Traffic stops are considered seizures subject to the strictures of these provisions and are "historically reviewed under the investigatory detention framework first articulated in *Terry v. Ohio*." *Id.* at 136–37 (quoting *State v. Styles*, 362 N.C. 412, 414 (2008)); *Reed*, 373 N.C. at 507. Law enforcement officers may initiate a traffic stop if the officer has a "reasonable, articulable suspicion that criminal activity is afoot." *Styles*, 362 N.C. at 414 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). The reasonableness of a traffic stop is determined "by examining (1) whether the traffic stop was lawful at its inception, and (2) whether the continued stop was 'sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.' " *Reed*, 373 N.C. at 507 (citations omitted) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Once the traffic stop is initiated, a law enforcement officer may conduct a limited search of the passenger compartment of the vehicle so long as the officer develops a reasonable suspicion that the suspect of the traffic stop is armed and dangerous. *Terry*, 392 U.S. at 27. The Supreme Court of the United States has extended the reasonable suspicion standard originally established in *Terry* to allow for these limited searches:

> [T]he search of the passenger compartment of an
> automobile, limited to those areas in which a weapon may
> be placed or hidden, is permissible if the police officer
> possesses a reasonable belief based on "specific and
> articulable facts which, taken together with the rational
> inferences from those facts, reasonably warrant" the officer
> in believing that the suspect is dangerous and the suspect
> may gain immediate control of weapons.

*Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (quoting *Terry*, 392 U.S. at 21).

Reasonable suspicion demands more than a mere "hunch" on the part of the officer

but requires "less than probable cause and considerably less than preponderance of

the evidence." *State v. Williams*, 366 N.C. 110, 117 (2012). In any event, reasonable

suspicion requires only "some minimal level of objective justification," *Styles*, 362

N.C. at 414 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)), and arises from

"specific and articulable facts which, taken together with rational inferences from

those facts, reasonably warrant" the intrusion presented by the limited search of the

vehicle, *Terry*, 392 U.S. at 21.

¶ 17    As discussed above, competent evidence exists in the record of the suppression

hearing that Officer Whitley encountered a "very nervous" individual—specifically,

defendant—late at night in a high-crime area. The officer saw defendant "blade" his

body by way of defendant's assumption of a physical position which the officer

interpreted to be an effort by defendant to conceal defendant's entry into the vehicle's

center console. "All [of] these things," Officer Whitley testified, were "adding up as,

from my training and experience, as characteristics of an armed suspect." Also, upon

Officer Whitley's return to his patrol car in order to conduct a criminal records check of defendant, the officer obtained information about defendant's criminal history that solidified the existence of reasonable suspicion for the officer to conduct a *Terry* search, based on the belief developed by Officer Whitley that defendant was armed and dangerous.

Standing alone, defendant's criminal record for which defendant has already paid his debt to society does not constitute reasonable suspicion and hence cannot singly serve as a basis for the law enforcement officer who effected the traffic stop to conduct a *Terry* search of the passenger compartment of defendant's vehicle.[2] Likewise, defendant's mere presence in a high-crime area does not solely provide the officer with the necessary reasonable suspicion to authorize the officer to order defendant to exit the vehicle so that the officer can look for weapons. *See State v. Jackson*, 368 N.C. 75, 80 (2015). Similarly, defendant's nervousness does not in and of itself amount to reasonable suspicion when displayed to a detaining officer. *State v. Pearson*, 348 N.C. 272, 276 (1998). However, we do not assess each of these factors, specifically articulated by Officer Whitley in this case, in isolation. *See Jackson*, 368

---

[2] However, a law enforcement officer's specific knowledge of a suspect's felonious criminal *convictions* alters the reasonable suspicion inquiry when the officer (1) conducts a lawful investigative stop of the suspect for the very conduct which serves as the basis for those criminal convictions (albeit this circumstance is not present here), and (2) testifies that based on the training and experience of the officer, the felonious conduct for which defendant has been convicted and is currently being investigated is normally associated with the possession of weapons. *State v. McGirt*, 122 N.C. App. 237, 240 (1996), *aff'd per curiam*, 345 N.C. 624 (1997).

N.C. at 80. We examine the totality of the circumstances surrounding Officer Whitley's interaction with defendant in order to achieve a comprehensive analysis as to whether the officer's conclusion that defendant may have been armed and dangerous was reasonable. *Id.* In the case at bar, in which the officer rendered uncontroverted testimony that he conducted a late-night traffic stop of defendant's vehicle in a high-crime area and encountered defendant who acted very nervous, appeared to purposely hamper the officer's open view of defendant's entry into the vehicle's center console, and possessed a criminal history which depicted a "trend in violent crime," we conclude that the officer's suspicion of defendant's potentially armed and dangerous status was reasonable. Therefore, Officer Whitley operated within the bounds of both the Fourth Amendment to the Constitution of the United States and article I, section 20 of the North Carolina Constitution in removing defendant from the Dodge Charger and searching the area of the vehicle's passenger compartment that was within defendant's control for weapons.

¶ 19 In determining that the aforementioned factors were sufficient to constitute reasonable suspicion for the officer's *Terry* search based on the totality of the circumstances, we have purposely and expressly removed from the assemblage of factors which were considered by the trial court to establish reasonable suspicion the factor gleaned from Officer Whitley's uncontroverted testimony that defendant's act of raising his hands and extending them from the driver's side window, so that

defendant's hands could readily be seen by the approaching officers, was interpreted by Officer Whitley as a sign that there could be the presence of a firearm in the vehicle. The officer testified at the suppression hearing that defendant's placement of defendant's hands figured into the officer's belief that defendant "was armed and dangerous at that point." The Court of Appeals, in giving deference to the officer's right "to rely on his experience and training" and to the trial court's order, included this factor of "raising one's hands" as defendant did in the present case to be properly considered in the totality of the circumstances which resulted in the existence of the officer's reasonable suspicion to execute the *Terry* search. *Johnson*, 269 N.C. App. at 85–86.

¶ 20 In his brief, defendant's appellate counsel argues that defendant's action of raising defendant's hands and clearly exposing them to the officers as they neared defendant's vehicle during the traffic stop should be construed differently than Officer Whitley, the trial court, and the Court of Appeals did:

> In this case, the trial court commended [defendant] for raising his hands and placing them out the window upon being stopped by officers . . . . He was praised by the trial court for taking action considered helpful to avoid getting shot, but this same action was found to establish, in part, the basis for a frisk for weapons. This presents an unjust choice.

¶ 21 We do not need, nor choose, to address any such real or perceived conundrum with regard to the existence of reasonable suspicion for the *Terry* search because in

this Court's view, the factor of defendant's raised hands upon the officer's effectuation of the traffic stop is unnecessary to consider for the purpose of the establishment of reasonable suspicion in light of the totality of the circumstances which include the other factors comprising the officer's reasonable suspicion which collectively have already been deemed by this Court to be sufficient in the present case. Like the Fourth Circuit Court of Appeals, we harbor some "concern about the inclination of the [State] toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity." *State v. Nicholson*, 371 N.C. 284, 291 n.4 (2018) (quoting *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011)). Nonetheless, for the purpose of our legal analysis as to the State's establishment of the existence of reasonable suspicion for the officer's *Terry* search, we conclude that the totality of the circumstances supports the trial court's ultimate conclusion that such reasonable suspicion existed, even after this Court eliminates defendant's gesture of raising his hands as a factor.

**D. Extension of the Stop**

Lastly, defendant contends that Officer Whitley's search of defendant's vehicle after discovering defendant's criminal history represented an unconstitutional extension of the traffic stop because "it seems evident that Officer Whitley was satisfied that a traffic citation for displaying a fictitious tag was not warranted under the circumstances as he did not issue such a citation." Therefore, defendant posits

that the officer's subsequent *Terry* frisk of defendant's person and accompanying search of defendant's vehicle were not in furtherance of the officers' safety while fulfilling the purpose of the traffic stop itself, but were instead independent investigative actions targeting other unarticulated suspicions of criminal activity. In defendant's view, since Officer Whitley did not demonstrate a reasonable suspicion prior to leaving defendant to conduct the criminal records check, coupled with the officer's inability to form reasonable suspicion to justify the *Terry* search based on defendant's criminal history alone, then the officer's decision to search defendant after the juncture when defendant assumes that Officer Whitley had decided not to charge defendant for the traffic violation constituted an unlawful extension of the traffic stop. This description mischaracterizes the timing of Officer Whitley's interactions with defendant and disregards the totality of the circumstances which yielded the factors upon which Officer Whitley formed the reasonable suspicion required to conduct the limited Fourth Amendment search.

¶ 23    "[T]he duration of a traffic stop must be limited to the length of time that is reasonably necessary to accomplish the mission of the stop, unless reasonable suspicion of another crime arose before that mission was completed." *State v. Bullock*, 370 N.C. 256, 257 (2017) (citations omitted). While this rule describes the temporal nature of the scope of a constitutionally appropriate traffic stop, the exercise of "police diligence 'includes more than just the time needed to issue a citation.' " *Reed*, 373

N.C. at 509 (quoting *Bullock*, 370 N.C. at 257). To ensure that the exercise of such enterprise by law enforcement remains within the confines of the Fourth Amendment, however, "an investigation unrelated to the reasons for the traffic stop must not prolong the roadside detention." *Reed*, 373 N.C. at 509. In order to prolong a traffic stop beyond the amount of time necessary to investigate and address the reason for the stop itself, the detaining officer must "possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." *Id.* at 510 (quoting *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008)). The development of a reasonable suspicion that a suspect may be armed in the normal course of an investigation into the basis for a traffic stop provides one such justification. *Id.* (quoting *Branch*, 537 F.3d at 336, to explain that prolonging a traffic stop "requires either the driver's consent or a reasonable suspicion that illegal activity is afoot").

¶ 24    Here, Officer Whitley testified that after observing that defendant exhibited some of the characteristics of an armed subject, the officer returned to the officer's patrol car in order to conduct a records check of defendant and of the vehicle itself to confirm the veracity of defendant's statements as to the ownership of the car. Such a course of action on the part of Officer Whitley is readily recognized as a proper function of the police during traffic stops which are effected under the Fourth Amendment, and the officer's deeds were directly related to addressing the purpose

of the stop itself. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). The officer's activities were not, as represented by defendant, exercises of the officer which were external to the traffic stop, nor did they prolong the stop beyond the mission's purpose. Although Officer Whitley testified that he did not intend to arrest defendant for the minor traffic infraction of a fictitious license plate which served as the impetus for the traffic stop, the officer did not testify—inconsistent with defendant's self-serving assumption—that the officer had already made a determination to refrain from charging defendant for the traffic violation at the time that the officer was engaged in the process of performing the records check. The officer's declination to issue a citation to defendant for the traffic offense, with only defendant's speculation as to the timing of the officer's decision to refrain from charging defendant with the violation in the dearth of any evidence to support defendant's theory, does not equate to a conclusion that the officer unreasonably prolonged the traffic stop. This is particularly true in light of the testimony rendered by Officer Whitley as to the actual chain of events and the observations by the officer which culminated in the *Terry* search. The officer represented at the suppression hearing that the records check was a standard aspect of any traffic stop that he conducted. The information obtained by the officer from the records check disclosed defendant's "trend in violent crime."

¶ 25      The entirety of the sequence of events which was started by virtue of Officer Whitley's initiation of a traffic stop of defendant's vehicle in order to investigate an

apparent license plate violation, during which the officer's interaction with defendant featured behavioral cues by defendant that prompted Officer Whitley to consider that defendant might be armed, which in turn led the officer to particularly note during the officer's routine records check that he performed pursuant to every traffic stop that he effectuated that defendant's criminal history indicated a "trend in violent crime," thus compelling Officer Whitley to believe that defendant was "armed and dangerous" and establishing reasonable suspicion in the officer's mind so as to justify a *Terry* frisk of defendant's person and a *Terry* search of defendant's vehicle for weapons in areas that were subject to defendant's direct and immediate control, demonstrate that there was not an unconstitutional extension of the traffic stop. In light of these facts, we adopt the observant phrase employed by the Supreme Court of the United States, "[c]learly this case does not involve any delay unnecessary to the legitimate investigation of the law enforcement officers." *United States v. Sharpe*, 470 U.S. 675, 687 (1985).

### III.    Conclusion

Based upon the foregoing factual background, procedural background, and analysis, we affirm the holding of the Court of Appeals finding no error in the trial court's order denying defendant's motion to suppress in agreement with the conclusion of the Court of Appeals as modified by our discussion in this opinion.

AFFIRMED.

Justice BERGER did not participate in the consideration or decision of this case.

Chief Justice NEWBY concurring.

I agree with the well-reasoned majority opinion that the evidence it considers was sufficient for the trial court to find Officer Whitley had reasonable suspicion to justify the limited *Terry* search for weapons in the area immediately surrounding defendant. Although not needed to resolve this case, however, I do not believe this Court should remove from the analysis defendant's gesture of raising his hands out of his car window. Like other movements, which may be innocent standing alone, with the proper testimony the act of raising one's hands can be a factor to support an officer's reasonable suspicion.

The trial court here found:

> 8. That after the Defendant stopped, he raised both of his hands in the air upon the officers' approach.
>
> 9. That Officer Whitley observed the Defendant's hands in the air, and based on Officer Whitley's training and experience, he believed that the gesture of raising one's hands in the air can indicate that a person has a gun inside the vehicle.
>
> 10. That based on his training and experience, Officer Whitley was on alert about the possible presence of a gun.

Based on these findings, the trial court concluded:

> 1. That the motion of having hands up upon an officer's approach does not automatically incriminate an individual by itself, and the Defendant's action of showing his hands was reasonable. However, based on an officer's experience, it is reasonable for an officer to infer that the motion of hands up upon an officer's approach could indicate the presence of a weapon.

Thus, based on Officer Whitley's testimony, the trial court included defendant's action of raising his hands as a factor to support reasonable suspicion.

¶ 29          The trial court properly considered all the relevant factors to determine that Officer Whitley had reasonable suspicion justifying the limited *Terry* search for a weapon. In determining whether reasonable suspicion exists, this Court "consider[s] 'the totality of the circumstances—the whole picture,' " *State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994) (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 695 (1981)), including the perspective "of a reasonable, cautious officer, guided by his experience and training," *State v. Styles*, 362 N.C. 412, 414, 665 S.E.2d 438, 439 (2008) (quoting *Watkins*, 337 N.C. at 441, 446 S.E.2d at 70). Other courts have found that a defendant's raised hands can support reasonable suspicion for a limited *Terry* search. *See Clark v. Clark*, 926 F.3d 972, 979 (8th Cir. 2019) (concluding that the defendant's action of "pull[ing] over and put[ting] his hands outside the driver's side window" supported reasonable suspicion for a *Terry* investigatory seizure and search of the defendant's vehicle for a gun); *State v. King*, 206 N.C. App. 585, 590, 696 S.E.2d 913, 916 (2010) (holding that "the unusual gesture of [the d]efendant placing his hands out of his window" supported reasonable suspicion for a limited *Terry* search); *cf. State v. Mbacke*, 365 N.C. 403, 404–10, 721 S.E.2d 218, 219–22 (2012) (analogizing the "reasonable to believe" standard from *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710 (2009), to the *Terry* reasonable suspicion standard to

conclude that officer had reason to believe the defendant's vehicle contained additional evidence of the offense of arrest to justify search for handgun while the defendant was detained outside the vehicle based on, *inter alia*, the defendant's furtive behavior of lowering hands off the steering wheel), *cert. denied*, 568 U.S. 864, 133 S. Ct. 224 (2012). Therefore, I believe the trial court properly relied on defendant's raised hands as a factor in finding the existence of reasonable suspicion. Otherwise, I fully concur with the majority opinion.

Justice EARLS dissenting.

The sole question before this Court is whether, under "the totality of the circumstances as viewed from the standpoint of an objectively reasonable police officer," *State v. Wilson*, 371 N.C. 920, 926 (2018) (cleaned up) (quoting *State v. Johnson*, 370 N.C. 32, 34–35 (2017)), it would be reasonable for an officer "to believe that he [was] dealing with an armed and dangerous individual" after initiating a traffic stop of Bryan Xavier Johnson. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). The majority answers in the affirmative. To reach this conclusion, the majority converts a jumble of subjective, innocuous, or irrelevant facts into indicia of dangerousness. The result is a decision inconsistent with the Fourth Amendment and which fails to consider the racial dynamics underlying reasonable suspicion determinations. Therefore, I respectfully dissent.

## I.   Reasonable suspicion under *Terry*

According to the majority, five factors contribute to the reasonable belief that Johnson was armed and dangerous under *Terry*: "(1) the traffic stop occurred late at night (2) in a high-crime area, with (3) defendant appearing 'very nervous' to the detaining officer to the point that it 'seem[ed] like his heart [was] beating out of his chest a little bit[,]' with (4) defendant 'blading his body' as he accessed the Dodge Charger's center console, and (5) defendant's criminal record indicating a 'trend in violent crime' and weapons-related charges." The majority repeatedly asserts that

although no one individual factor may be sufficient to justify the search "standing alone," these factors are sufficient when viewed collectively under the "totality of the circumstances." Although I agree with the majority that *Terry* demands a flexible, holistic approach, I cannot join the majority in its refusal to enforce the limits imposed by the Fourth Amendment on the State's authority to conduct warrantless searches. Facts which individually do not contribute to reasonable suspicion in isolation should not be accorded outsized significance merely because they appear alongside other facts which also do not contribute to reasonable suspicion. Even viewed under the "totality of the circumstances," I would hold that the State has failed to meet its burden of proving that an objective officer would reasonably believe Johnson was armed and dangerous at the time Officer Whitley initiated the search of his vehicle.

### 1. *Presence in a "high crime area" late at night*

At the suppression hearing, Officer Whitley described the area in which he apprehended Johnson as a "very high crime area, where we have a lot of narcotic sales." A defendant's presence in a "high crime area" can sometimes be "among the relevant contextual considerations in a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) However, a defendant's presence in a "high crime area" is only probative when it is paired with conduct suggesting the defendant's presence is in some way connected to the criminal conduct known to occur in that area. There must

be some basis for suspecting the individual was someone other than one of the countless innocent people whose daily routines involve spending time in a "high crime area" for the individual's mere presence to be relevant.

¶ 33        Thus, in *State v. Butler*, it was not the defendant's mere presence on a street corner the arresting officer "knew . . . to be a center of drug activity" which contributed to reasonable suspicion, it was the defendant's presence coupled with the fact that the defendant "was seen in the midst of a group of people congregated on a corner known as a 'drug hole'" and that "upon making eye contact with the uniformed officers, [the] defendant immediately moved away, behavior that is evidence of flight." 331 N.C. 227, 233 (1992). Similarly, in *State v. Jackson*, the defendant's presence in a "high crime area" contributed to reasonable suspicion because the defendant "stood at 9:00 p.m. in a specific location known for hand-to-hand drug transactions . . . walked in [the] opposite direction[ ] upon seeing a marked police vehicle approach . . . came back very near to the same location once the patrol car passed . . . [and] walked [away] a second time upon seeing [the police officer] return." 368 N.C. 75, 80 (2015). In both cases, it was the combination of a defendant's presence in a "high crime area" with behavior suggestive of the defendant's personal involvement in the area's criminal activities which made the defendant's geographic location relevant under *Terry*.

¶ 34        By contrast, in this case, Johnson did not do anything to suggest his presence

in a "high crime area" was in any way motivated by or connected to the alleged prevalence of drug trafficking in that neighborhood. He was simply driving his vehicle down Central Avenue in Charlotte. He was stopped because the license plate on his vehicle was not registered to the type of vehicle he was driving. He was not observed interacting with suspected drug dealers, visiting places where drug transactions were known to occur, or attempting to evade the police. Nothing Officer Whitley observed distinguished Johnson from the many other people who undoubtedly pass through this "high crime area" with no intention of doing anything other than getting from one location to the next. In my view, this renders Johnson's physical location irrelevant to the *Terry* analysis.

¶ 35        There is nothing reasonable about believing that an individual is armed and dangerous merely because he drove his vehicle down a particular street, no matter where that street is located. The majority's rejoinder that Johnson's location is probative when considered "in the totality of the circumstances" does not answer the question of why Johnson's presence in this particular location in any way suggested he was armed and dangerous. Johnson's conduct did nothing to convert Officer Whitley's generalized observation about the nature of the area into a reasonable, particularized, and individualized suspicion regarding Johnson. The majority's position risks "making the simple act of [driving] in one's own neighborhood a possible indication of criminal activity." *Jackson*, 368 N.C. at 80.

¶ 36          In his brief, Johnson does not appear to directly challenge the trial court's implied finding of fact that the area he was travelling through was fairly characterized as a "high crime area." However, in a different case, it may be necessary for this Court to define what a "high crime area" is, what competent evidence is necessary to support the finding that a defendant was located in one, and the circumstances under which a defendant's presence in a "high crime area" supports an officer's reasonable suspicion that he is armed and dangerous.

¶ 37          For example, the First Circuit has held that in order for a defendant's location in a "high crime area" to contribute to reasonable suspicion, the government is required to present evidence tending to prove "(1) [a] nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case, (2) limited geographic boundaries of the 'area' or 'neighborhood' being evaluated, and (3) temporal proximity between evidence of heightened criminal activity and the date of the stop or search at issue." *United States v. Wright*, 485 F.3d 45, 53–54 (1st Cir. 2007) (citations omitted). Further, while it is certainly appropriate to credit "the testimony of police officers[ ] describing their experiences in the area" in determining whether an area is a "high crime area," I would agree with the First Circuit that we should also look to data and other sources of information to ensure the reasonableness inquiry at the heart of the *Terry* analysis remains tethered to objective facts. *Id.* at 54; *see also N. Mariana Islands v. Crisostomo*, 2014 WL 7072149, at *2 (N. Mar. I.

Dec. 12, 2014) ("[A]n officer's confident body language and tone of voice are not enough to prove a high-crime claim. Allowing such a finding solely through unsubstantiated testimony (no matter how confidently stated) would give police the power to transform 'any area into a high crime area based on their unadorned personal experiences.' " (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1143 (9th Cir. 2000))).

¶ 38          Further, I share the concern expressed by many courts that encouraging reliance on undefined, amorphous signifiers like "high crime area" as a proxy for suspected criminal activity risks subjecting identifiable racial minority communities to disproportionate, invasive, and unlawful searches. *See, e.g.*, *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006) ("[L]abeling an area 'high-crime' raises special concerns of racial, ethnic, and socioeconomic profiling."); *Montero-Camargo*, 208 F.3d at 1138 ("The citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity."). There is research demonstrating that the reported rate of crime in a particular geographic area is driven not only by the actual incidence of criminal conduct in that area, but also by law enforcement's choices regarding where and how to conduct enforcement activities. *See* Sandra G. Mayson, *Bias in, Bias Out*, 128 Yale L.J. 2218, 2253 (2019) ("Blacks are more likely than others to be arrested in almost every city for almost every type of crime.

Nationwide, black people are arrested at higher rates for crimes as serious as murder and assault, and as minor as loitering and marijuana possession."); *see also* K. Babe Howell, *Prosecutorial Discretion and the Duty to Seek Justice in an Overburdened Criminal Justice System*, 27 Geo. J. Legal Ethics 285, 298 (2014) ("It is the police who choose what areas to target, who respond to calls, and who make the initial decision whether to make an arrest or issue an informal warning when minor misconduct occurs."). My concern is especially acute in this case because Officer Whitley "did not observe [defendant] engage in any type of behavior that is consistent with [the criminal] activity" thought to occur with greater frequency in the area where he was apprehended. *United States v. Beauchamp*, 659 F.3d 560, 570 (6th Cir. 2011).

¶ 39 I have similar concerns regarding the majority's reliance on the fact that "the traffic stop took place late at night." It is correct that this Court has previously held the time of night when a stop occurs to be "an appropriate factor for a law enforcement officer to consider in formulating a reasonable suspicion." *State v. Watkins*, 337 N.C. 437, 442 (1994). Yet we have also recognized a difference between being present late at night in a place where it is expected people might be found at that hour and being present late at night somewhere where one's presence is anomalous. Thus, in *Watkins*, we distinguished between a defendant "standing in an open area between two apartment buildings . . . in Greensboro, an urban area, shortly after midnight" and a defendant who was observed "proceeding slowly on a dead-end street of locked

businesses at 12:50 a.m. in an area with a high incidence of property crime." *Id.* The latter circumstance was indicative of reasonable suspicion while the former was not. There must be some other objective basis from which to infer that the individual is travelling late at night for a nefarious purpose and is not just a parent heading home to tuck his or her children in after a late-night shift.

¶ 40        In this case, there is no evidence indicating Johnson's presence or behavior was unusual or alarming for the place and hour. There is no evidence that individuals who drive down Central Avenue late at night are disproportionately likely to be armed and dangerous. Nor is there any evidence that individuals who possess guns and present a danger to law enforcement officers tend to travel at night. *Cf. United States v. Williams*, 808 F.3d 238, 249 (4th Cir. 2015) ("This record does not make an evidentiary connection between nocturnal travel and drug trafficking . . . . Absent such a connection, that the traffic stop of [the defendant] occurred at about 12:37 a.m. does not contribute to a reasonable, articulable suspicion for extending the otherwise-completed traffic stop . . . ."). Accordingly, I would hold that neither the location nor the time of the traffic stop contribute to a reasonable suspicion that Johnson was armed and dangerous under *Terry*.

### 2. *Nervousness*

¶ 41        We have previously held that nervousness can be "an appropriate factor to consider when determining whether a basis for a reasonable suspicion exists." *State*

*v. McClendon*, 350 N.C. 630, 638 (1999). But nervousness only supports an officer's reasonable suspicion when it is something "more than ordinary nervousness." *Id.* at 639. "This Court has expressly determined that *general nervousness* is not significant to reasonable suspicion analysis because many people become nervous when stopped by a [law enforcement officer]." *State v. Reed*, 373 N.C. 498, 515 (2020) (cleaned up) (emphasis added) (quoting *State v. Pearson*, 348 N.C. 272, 276 (1998)). We have treated nervousness as supporting an officer's reasonable suspicion when the defendant "was fidgety and breathing rapidly, sweat had formed on his forehead, he would sigh deeply, and he would not make eye contact with the officer," but we also explained that when "the nervousness of the defendant [is] not remarkable . . . it d[oes] not support a reasonable suspicion." *McClendon*, 350 N.C. at 639.

¶ 42        None of the twenty-four findings of fact contained in the trial court's order on the motion to suppress included any reference to Johnson's alleged nervousness. While the trial court was not required by statute to reduce all its findings to writing, it goes beyond the scope of appellate review to accord deference to a supposed fact based solely on the officer's observations of the witness's demeanor, when the trial court itself made no such finding. Silence by the trial court is not endorsement of the witness' veracity nor does it give the appellate court any guidance as to the weight to accord that testimony.

¶ 43        Finally, even if it is proper to consider evidence not incorporated into any of

the trial court's express findings of fact, the record does not support the conclusion that Johnson was unusually or remarkably nervous. The only evidence attesting to Johnson's level of nervousness is Officer Whitley's testimony that he "seemed very nervous and to the point of where, as you can imagine, his heart's beating, but it seems like his heart is beating out of his chest a little bit. He was very nervous. . . . you could see his heart rising in his chest." However, Johnson did not exhibit any physical symptoms of anything other than an ordinary response to an understandably stressful situation. He did not act in an inexplicable or aberrant manner, he did not appear disoriented or disheveled, and he did not do anything other than respond to Officer Whitley's questions appropriately and intelligibly. Absent any evidence that Johnson was inordinately nervous, Officer Whitley's bare assertion that Johnson was "very nervous" in no way contributes to the reasonable suspicion that he was armed and dangerous.

¶ 44        Other courts have expressed skepticism regarding the probative value of an officer's observation that the defendant was nervous during a traffic stop. *See, e.g.*, *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994) ("We have repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on the nervousness of either the driver or passenger as a basis for reasonable suspicion 'in all cases of this kind must be treated with caution.' " (cleaned up) (quoting *United States v. Millan-Diaz*, 975 F.2d

720, 722 (10th Cir. 1992))). And with good reason. Common sense tells us it is not at all surprising that an individual might look and feel nervous, even "very nervous," when interacting with a law enforcement officer in this context. *See, e.g.*, *United States v. Beck*, 140 F.3d 1129, 1139 (8th Cir. 1998) ("It certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer."); *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997) ("It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer."); *State v. Schlosser*, 774 P.2d 1132, 1138 (Utah 1989) ("When confronted with a traffic stop, it is not uncommon for drivers and passengers alike to be nervous and excited and to turn to look at an approaching police officer."). Even physical manifestations of nervousness do not necessarily warrant the inference that an individual is hiding something. *See State v. Anderson*, 258 Neb. 627, 641 (2000) ("Trembling hands, a pulsing carotid artery, difficulty locating a vehicle registration among documents in a glove box, and hesitancy to make eye contact are signs of nervousness which may be displayed by innocent travelers who are stopped and confronted by an officer.").

¶ 45          Our traditional distinction between general nervousness—which does not support an officer's reasonable suspicion—and extreme nervousness—which may support an officer's reasonable suspicion—reflects this reality. The majority's decision to rely upon Johnson's nervousness in this case, based solely upon Officer

Whitley's testimony that he observed Johnson's heart "beating out of his chest a little bit," erodes that distinction and turns an entirely understandable physiological response into a ground for conducting a warrantless search.

¶ 46    There are numerous completely innocent reasons why any person might be nervous during a traffic stop. There are also specific reasons why someone who looks like Johnson—a large Black man—might be especially nervous during a traffic stop. Black people are more likely than white people to be pulled over while driving, more likely than white people to be subjected to investigatory stops, and more likely than white people to be shot and killed by law enforcement officers.[1] Any driver who has followed the news in recent years would have learned the names of numerous people of color killed during or after routine traffic stops. These encounters can be fraught under any circumstance and especially so when the driver fears that one false step might cost him his life. Thus, I cannot agree with the majority that Johnson's purported level of apparent nervousness, as described by the officer's testimony in

---

[1] *See, e.g.*, Emma Pierson et al., *A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States*, 4 Nature Hum. Behav. 736, 736 (July 2020), https://doi.org/10.1038/s41562-020-0858-1 ("We assessed racial disparities in policing in the United States by compiling and analysing a dataset detailing nearly 100 million traffic stops . . . . Our results indicate that police stops and search decisions suffer from persistent racial bias . . . ."); Wesley Lowery, *A Disproportionate Number of Black Victims in Fatal Traffic Stops*, Washington Post (Dec. 24, 2015), https://www.washingtonpost.com/national/a-disproportionate-number-of-black-victims-in-fatal-traffic-stops/2015/12/24/c29717e2-a344-11e5-9c4e-be37f66848bb_story.html (finding that one third of all individuals shot and killed during traffic stops in 2015 were Black, "making the roadside interaction one of the most common precursors to a fatal police shooting of a black person in 2015").

this case, can support a rational inference that he was armed and dangerous.

### 3. *Blading*

The majority holds that Officer Whitley's testimony Johnson was "blading [his body] . . . as if he [was] trying to conceal something" contributes to reasonable suspicion under *Terry*. To be precise, this fact—which the trial court did not explicitly find—is based entirely upon Officer Whitley's perception that Johnson did not reach into his center console in the way Officer Whitley believed a driver "typically" would. I do not dispute that "an obvious attempt to hide or to evade the authorities can be a factor in the calculus of reasonable suspicion." *United States v. Woodrum*, 202 F.3d 1, 7 (1st Cir. 2000). However, I disagree with the majority that Officer Whitley's subjective perception that Johnson "bladed" his body contributes to reasonable suspicion in this case.

The significance of Johnson's motion in retrieving his paperwork from the center console of his vehicle lies entirely in the meaning a reasonable officer would ascribe to the motion, not in the motion itself. "[N]ot every slouch, crouch, or other supposedly furtive movement justifies a stop. The proper inquiry is case-specific and context-contingent, and the surrounding circumstances ordinarily will tell the tale." *Id.* (citation omitted). Here, Johnson's body movement is probative only insofar as a reasonable officer would perceive his movement to be an effort to shield a weapon from view. For this reason, it is notable that when Johnson supposedly "bladed" his

body to shield the contents of his center console from Officer Whitley's view, there was another officer standing on the other side of the vehicle looking in through the passenger side window. Further, it is not as if Johnson's movements were unnatural or disconnected from the events of that moment. He was a large man reaching across his body while remaining seated in his vehicle. The fact that he lifted his shoulders off the seat to do is not a reason to conclude he was armed and dangerous.

¶ 49         We should be hesitant to rely so completely on the subjective perceptions of an individual officer whose interpretation of a body motion that is not inherently suspicious is the sole basis for the conclusion that Johnson's movements contributed to reasonable suspicion. We should be especially hesitant to do so when the trial court did not enter an express finding of fact that Johnson "bladed" his body. This Court is not a factfinding tribunal, and it stretches both our competence and authority when we "[i]nfer[ ] additional findings, ones that go beyond what the trial court actually found, to rescue an otherwise insufficient ruling of the trial court." *State v. Johnson*, 269 N.C. App. 76, 88–89 (2019) (Murphy, J., dissenting).[2] Further, "an officer's impression of whether a movement was 'furtive' may be affected by unconscious racial

---

[2] The majority asserts that it is appropriate to imply facts not expressly found by the trial court because the trial court noted its ruling was "based on the totality of [the] circumstances, *including but not limited to* [the enumerated facts]." Similarly, the majority argues its factfinding endeavor is appropriate because Officer Whitley's testimony was "uncontroverted." But uncontroverted testimony is not the same as an established fact—it is for the trial court to "itself determine what pertinent facts are actually established by the evidence before it." *Coble v. Coble*, 300 N.C. 708, 712 (1980).

biases," which is an additional reason to leave factfinding, which often involves credibility determinations, to the trial court. *Floyd v. City of New York*, 959 F. Supp. 2d 540, 578 (S.D.N.Y. 2013).

¶ 50        Even if it is proper to treat Officer Whitley's testimony regarding Johnson's "blading" his body as an express finding of fact, this fact adds little to the reasonable suspicion calculus. *Cf. State v. Johnson*, 2006 WI App 15, ¶ 18, 288 Wis. 2d 718, 709 N.W.2d 491, *aff'd*, 2007 WI 32, 299 Wis. 2d 675, 729 N.W.2d 182 (concluding that the defendant's "furtive" movements did not support reasonable suspicion he was armed and dangerous because "[t]he officers pulled [the defendant] over for traffic violations . . . and not for a crime[,]" and the officers "had no prior contacts with [the defendant] that would suggest that he would be armed or otherwise dangerous"). This Court has never before recognized "blading" as a behavior which gives rise to the reasonable inference that an individual is armed and dangerous. In the only other Court of Appeals decision previously recognizing "blading" as a contributing factor under *Terry*, the defendant "bladed" his body in such a way as to prevent the arresting officer from viewing his hip, where a firearm is often carried, immediately after making eye contact with the officer. *State v. Malachi*, 264 N.C. App. 233, 238, *appeal dismissed*, 372 N.C. 702 (2019). In that case, there was no other reason for the defendant to move his body in that manner. Furthermore, the officer in that case testified about the basis for his suspicion including training he received that a person

with a gun often turns his hip to hide the weapon. *See Malachi,* 264 N.C. App. at 237-38. Finally, officers had received an anonymous tip that someone wearing a red shirt and black pants had put a gun in his waistband. *Id.,* at 234. By contrast, in this case, there was no tip, there was no testimony regarding the officer's training, and most importantly, Johnson was moving his body to accomplish an apparent, noncriminal purpose. Indeed, courts in other jurisdictions have concluded that movements which are contextually appropriate and not inherently suspect do not contribute to the reasonable suspicion analysis. *Cf. United States v. Hood*, 435 F. Supp. 3d 1, 8 (D.D.C. 2020) (rejecting the government's "blading" argument because "the positioning of [the defendant's] body seems consistent with an individual who was crossing a street at a diagonal from north to south"). Therefore, I would not consider Johnson's alleged "blading" significant in the reasonable suspicion analysis.

### 4. *Prior record*

The majority finds probative Officer Whitley's testimony that he believed Johnson was "armed and dangerous" after he reviewed Johnson's criminal record and discerned a "trend in violent crime." I would conclude this finding is unsupported by competent evidence in the record and thus cannot contribute to the reasonable suspicion analysis in this case.

At the suppression hearing, Officer Whitley could not recall the dates of the entries he viewed in Johnson's record, whether those entries documented charges or

convictions, or the total number of charges or convictions Johnson's record contained. He did recall that that the dates of these entries "started somewhere around 2003 to the 2009 mark." In 2009, it might have been reasonable to conclude, based on this evidence, that Johnson's criminal record indicated a "trend in violent crime." In 2017, when the stop occurred, eight years had passed since Johnson had been charged or convicted of *any* crime, let alone a violent one. Notwithstanding this lengthy gap, the majority concludes Johnson's criminal record supports the reasonable belief he was armed and dangerous in 2017.

¶ 53          A trend implies some accounting for recent events. Otherwise, it would be correct to say that the Seattle Supersonics have demonstrated a "trend in winning basketball games," even though they ceased to exist around the same time as Johnson's last conviction. By concluding that it would be reasonable for an officer to ignore the eight-year period during which Johnson maintained a clean record immediately preceding the traffic stop, the majority suggests that no matter how far back in time an individual's prior charges and convictions occurred, no matter how successful that individual has been in re-entering society, it is reasonable for an officer to believe that an individual with a prior record is a threat. At a minimum, we should make clear that "the age of [a defendant's] convictions is a factor to consider in determining their relevance" in the *Terry* analysis to avoid lending the impression that once an individual has been arrested or convicted of some crime, he is marked

as presumptively dangerous for life. *United States v. Scott*, 818 F.3d 424, 431 (8th Cir. 2016); *see also United States v. Falso*, 544 F.3d 110, 122 (2d Cir. 2008) (holding with respect to warrant application based in part on 18-year-old conviction that "even if [the defendant's] prior conviction were relevant to the analysis, it should have only been marginally relevant because the conviction was stale").

¶ 54    Under these circumstances—where the defendant's last conviction occurred eight years prior to the traffic stop and there is no indication the defendant continued to engage in criminal activity in the intervening years—I disagree with the majority that Johnson's criminal record supports the reasonable belief he was armed and dangerous at the time of the traffic stop, "[s]tanding alone" or otherwise. I also note that prior convictions are not evenly distributed among all segments of the population and that the distribution of convictions does not necessarily track meaningful distinctions in the frequency or severity of criminal conduct engaged in by members of different racial or ethnic groups. *See, e.g., Terry v. United States*, 141 S. Ct. 1858, 1865 (2021) ("Under [federal] law, crack cocaine sentences were about 50 percent longer than those for powder cocaine. Black people bore the brunt of this disparity." (citation omitted)); *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 220 (2d Cir. 2020) ("As the statistics show, there are significant racial disparities in arrest, conviction, and incarceration rates in this country."). Absent further clarification from this Court regarding the significance of an individual's prior criminal record, I worry that our

decision today will allow historic racial disparities in policing to perpetuate ongoing ones.

¶ 55        One of the fundamental principles of our common law jurisprudence is that we punish acts, not an individual merely because of his or her status. *See, e.g., Robinson v. California*, 370 U.S. 660 (1962) (holding a California law making it illegal to be a drug addict unconstitutional because the mere status of being a drug addict was not an act and thus not criminal.). The majority's conclusion that Johnson's prior criminal record contributes to reasonable suspicion—which treats his more recent, lengthier period of non-involvement with the criminal justice system as irrelevant—conveys the unmistakable impression that "felon" is a lifelong status which renders an individual's choices and behavior irrelevant. Moreover, the majority's reasoning contributes to a legal reality in which an individual's felony conviction is used to justify according an entire class of people diminished constitutional protections, going well beyond the legal debilities imposed by our constitution and statutes on individuals who have been convicted of a felony offense.

### 5. *Raising hands*

¶ 56        The majority notes that its conclusion there was reasonable suspicion to search Johnson's vehicle is in no way predicated on the fact that Johnson placed his hands up in the air when he was stopped by Officer Whitley. I wholeheartedly agree that Johnson's conduct in this respect should be given no probative weight in the *Terry*

analysis. I would also go a step further and resolve the "real or perceived conundrum" that arises when the State claims that a defendant's raising his hands when surrendering to a law enforcement officer is evidence supporting a reasonable suspicion that the defendant is armed and dangerous.

¶ 57        The very obvious problem with this claim is that raising one's hands in this manner is an entirely natural way for one person to signal to another that they mean no harm. Indeed, police officers will often order an individual suspected of being armed and dangerous to raise his hands, and the individual's failure to do so would certainly contribute to reasonable suspicion under *Terry*. *See United States v. Soares*, 521 F.3d 117, 121 (1st Cir. 2008) (concluding there was reasonable suspicion where the defendant "refused repeated orders to remain still and keep his hands in [the officer's] view"). At the same time, courts have held that it contributes to reasonable suspicion when a defendant moves his hands out of view of the arresting officer. *See United States v. Johnson*, 212 F.3d 1313, 1316–17 (D.C. Cir. 2000) (concluding that the defendant's "shoving down" motions with his hands were motions "which a reasonable officer could have thought were actually suggestive of hiding (or retrieving) a gun"). If raising one's hands contributes to reasonable suspicion, and failing to raise one's hands contributes to reasonable suspicion, then there is always reasonable suspicion.

¶ 58        The concurrence treats Johnson's hand raising as the majority treats every

other fact it believes contributes to reasonable suspicion—according to the concurrence, while raising one's hands may sometimes be an innocent gesture, it takes on talismanic significance when considered "in the totality of the circumstances." The assertion is that "[l]ike other movements, which may be innocent standing alone, with the proper testimony the act of raising one's hands can be a factor to support an officer's reasonable suspicion." But the "proper testimony" referred to here is only the officer's subjective belief that the conduct was suspicious. This is not what the law requires. To protect Fourth Amendment rights this Court must ask whether the officer can articulate a reasonable, objective basis for his suspicion. Allowing "the proper testimony" to magically transform innocent acts into suspicious ones makes those rights illusory. As we recently stated in *Reed*,

> An officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). An obvious, intrinsic element of reasonable suspicion is a law enforcement officer's ability to articulate the objective justification of his or her suspicion. . . . [We cannot] conveniently presuppose a fundamental premise which is lacking here in the identification of reasonable, articulable suspicion: the suspicion must be articulable as well as reasonable.

*Reed*, 373 N.C. at 514. Today's decision fails to adhere to this recent precedent.

¶ 59    The majority pays lip service to our previously stated "concern about the inclination of the [State] toward using whatever facts are present, no matter how

innocent, as indicia of suspicious activity." *State v. Nicholson*, 371 N.C. 284, 291 n.4 (2018) (quoting *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011)). But the Fourth Amendment requires us to avoid "plac[ing] undue weight on [the arresting officer's] subjective interpretation of the facts rather than focusing on how an objective, reasonable officer would have viewed them." *Nicholson*, 371 N.C. at 291–92. In this case, the only "evidence" linking Johnson's hand motion to a risk of dangerousness was Officer Whitley's testimony that "typically when people [raise their hands in this manner], sometimes it can mean that they have a gun." We should not blindly acquiesce to one officer's subjective interpretation, which runs contrary to common sense and which makes the individuals most likely to experience trepidation when interacting with law enforcement more likely to be deemed suspicious because of their efforts to mitigate the risk of an encounter turning violent. Absent specific evidence illustrating why a hand gesture commonly understood to convey that the individual making the gesture means no harm should instead be understood as evidence that the individual is a threat, I would hold that this hand gesture does not contribute to reasonable suspicion under *Terry*.

## II. Conclusion

¶ 60     Johnson did everything he was supposed to do when he was stopped by police officers. When he saw flashing lights in his rearview mirror, he pulled over "fairly immediately." When an officer approached his vehicle, he placed his hands up and

out of the driver side window to show that he was unarmed. When the officer asked him why his license plate did not match the registration for his vehicle, he explained that he had purchased the vehicle earlier that day and reached into his center console to retrieve corroborating paperwork, including a bill of sale. When the officer asked him to step out of his vehicle, he stepped out of his vehicle. When the officer asked him to consent to a frisk for weapons, he consented. The officer found nothing suspicious on his person.

¶ 61        Under *Terry,* our analysis is supposed to focus on the behavior of each individual defendant under the circumstances of each individual case, but in this case nothing Johnson did mattered. Rather than hold the State to its burden under the Fourth Amendment, the majority reasons that the whole of the evidence supporting reasonable suspicion is greater than the sum of the parts. In doing so, the majority converts a generalized hunch into individualized suspicion, eroding the Fourth Amendment rights of all North Carolinians in the process. The majority also ignores, and may well exacerbate, issues relating to racially disparate policing, issues which have been forthrightly examined by many courts confronted with similar kinds of *Terry* claims. Therefore, respectfully, I dissent.

        Justice HUDSON joins in this dissenting opinion.